Askew vs. Dupree.

## ASKEW vs. DUPREE.

1. Notwithstanding the statute directs a license to issue in case of marriage, and inflicts a penalty upon any minister of the gospel or magistrate who performs the ceremony without such license; yet in the absence of any positive enactment declaring that all marriages not celebrated in the forms prescribed shall be void, a marriage deliberately and intentionally entered into—*per verbi de presenti*—that is, "I take you to be my wife," and, "I take you to be my husband"—by parties able to contract, is to all intents and purposes a valid marriage, notwithstanding the parties have failed to comply with the statutory provisions.

In Equity, in Pike Superior Court.    Decision by Judge CABANISS, November Term, 1859.

James F. Dupree and his wife, Uriah E. Dupree, filed their bill in equity against Uriah Askew, for an account of the estate of Mrs. Dupree in defendant's hands, as her guardian, and also to recover the remainder of her distributive share of the estate of her deceased father, in the hands of defendant, as administrator. The bill alleged the marriage of complainants, and the right thereby of said James F., by virtue of said marriage to recover and receive the estate and amount belonging to and due his wife.

To this bill the defendant pleaded in abatement, that complainants were not man and wife, and they were misjoined as complainants. That they were never lawfully married; that the pretended marriage between them was solemnized by A. Buckner, as a Minister of the Gospel, but that said Buckner was not at the time of the solemnization of said pretended marriage, a Minister of the Gospel of any christian order or denomination, and was not clothed with any ministerial powers or functions, but had long before that time, to-wit: at the August Conference in the year 1855, of the Griffin Baptist Church, been deposed from the ministry of said church, and his credentials as such surrendered, cancelled and revoked, and said Buckner excommunicated from said church, by means whereof he became and was totally disqualified to perform marriage rites and ceremonies, and that said marriage was null and void.

To this plea complainants demurred. The Court sustained the demurrer, and held the plea insufficient in law.

To which decision counsel for defendant excepted, and assigned the same as an error.

It may be proper to add, that the marriage between complainants was solemnized 25th Dec., 1855, and that a marriage license had been taken out dated 24th Dec., 1855, and upon which was endorsed the following, viz :

" I certify that Mr. J. F. Dupree and Miss U. E. Askew were duly joined in matrimony by me, this 25th day of December, 1855.

(Signed,)            " A. BUCKNER, M. G."

GREEN & STEWART, for plaintiff in error.

PEEBLES & CABANISS, DOYAL & CAMPBELL, *contra.*

*By the Court*—LUMPKIN, J., delivering the opinion.

As an act of justice to the ability and research of Judge Cabaniss, I have determined to publish his opinion in this case without alteration or abridgement. It is entitled to be preserved in a permanent form, as a monument of the learning and industry of that most excellent man and magistrate.

Says the Judge :

" The bill is filed by James F. Dupree and his wife, Uriah E. Dupree, against Uriah Askew, to recover the amount due said Uriah E. Dupree from said Uriah Askew, as her guardian ; also, the remainder of her distributive share of the estate of her deceased father, now in the hands of the defendant as his administrator. The bill alleges the marriage of the complainants, and the consequent right of James F. Dupree, by virtue of their intermarriage, to recover and receive the amount due his wife.

" To this bill the defendant has filed a plea in abatement, and for cause of plea says that said bill of said complainants ought to be abated and dismissed, because he says that said complainants were not in terms of the law, in such cases made and provided, duly and legally married as set forth and alleged in said bill, and that the said James F. Dupree is not, and never has been legally the husband of the said Uriah E., and therefore is not entitled to have or maintain the said suit as co-complainant with the said Uriah E. for the re-

covery of any of the matters or things set forth in said bill. " And the defendant further says, that the pretended marriage between the said complainants, James F. Dupree and Uriah E. Askew, was pretended to have been solemnized by one A. Buckner, as a Minister of the Gospel, when he, the said Buckner, was not then and there a Minister of the Gospel of any christian order whatever, and was not in any way clothed with the power of ministerial ordination, but was long before that time, to-wit: at the August Conference in the year 1855, of the Griffin Baptist Church, required to render up to said church his credentials, as a Minister of the Gospel, which he then and there did, which said credentials were then and there cancelled, revoked and annulled, and the said A. Buckner then and there excommunicated from said church, by means whereof the said A. Buckner became, and was totally disqualified to perform marriage ceremonies. All of which matters and things the defendant doth aver to be true, and pleads the same in abatement of said bill, and demands the judgment of the Court, whether he ought to make any answer to said bill of complaint.

" To this plea the complainants have demurred, and the question for the determination of the Court is, admitting the facts set forth in the plea to be true, is the marriage of the complainants valid ? Admitting that A. Buckner at the time he performed the marriage ceremony between James F. Dupree and Uriah E. Askew was deprived of his functions as a Minister of the Gospel, and was excommunicated from the church of which he had previously been a member, is the marriage of the parties valid and binding according to law ? Do they legally bear and sustain to each other the relation of husband and wife ? If yea, the complainant, James F. Dupree, has the right, by virtue of his intermarriage with Uriah E. Askew, to recover and receive whatever amount is due her from her guardian, and the administrator of her deceased father. If he has not been lawfully married to her, and is not her husband, he has no such right of recovery.

" The sole question, then, made by the plea and the demurrer thereto, is the validity of the marriage between the complainants.

" Another question which was discussed by counsel, both for complainants and defendants in the argument before the Court, viz : whether A. Buckner was a Minister of the Gospel

Askew *vs.* Dupree.

at the time he performed the marriage ceremony, is not legitimately made by the plea and demurrer.

"The plea alleges that he was deprived of his ministerial functions—was excommunicated from the church of which he had been a member; that he was required to surrender up his credentials as a Minister of the Gospel, which he did, and therefore they were cancelled, revoked and annulled. The demurrer admitting, these facts to be true, ends that question. According to facts admitted to be true, he was not then and there a Minister of the Gospel.

"His authority to act as a Minister of the Gospel was derived from the church of which he was a member at the time of his ordination, and when that authority was revoked and taken from him, he ceased to be a minister.

"Such are the facts alleged in the plea; their truth is admitted by the demurrer, and the conclusion follows as a matter of course.

"But the true question in this case, and one of no small magnitude and importance, is this: Is a marriage when the ceremony is performed by an unauthorized person, valid and binding in law?

"Let us, in the first place, ascertain the legal principles which are involved in this question. And the first, and the foundation of all the rest, is that marriage is a civil contract. It is so defined in all the elementary works, and in the two most generally approved and used in this country—Blackstone's and Kent's Commentaries; and it is so defined by Judges learned in the law in decisions pronounced by them.

"Sir William Scott who was not surpassed for learning and ability by any Judge who ever presided in any of the Courts in England, in one of his best considered and most elaborate opinions, *Dalrymple vs. Dalrymple*, 4 *Eng. Eccl. Rep.*, 485, has exhausted the learning on this subject. He says, 'Marriage, in its origin, is a contract of natural law'—'in civil society, it becomes a civil contract, regulated and prescribed by law, and endued with civil consequences.'

"Perhaps the most accurate definition of marriage is found in *Bishop on Marriage and Divorce, sec.* 29.

"The word marriage is used to signify either the act of entering into the marital condition, or the condition itself. In the latter and more frequent legal sense, it is a civil status, existing in one man and one woman, legally united for life

Askew *vs.* Dupree.

for those civil and social purposes, which are based in the distinction of sex. Its source is the law of nature whence it has flowed into the municipal laws of every civilized country, and into the general law of nations. And since it can exist only in pairs, and since no persons are compelled, but all who are capable are permitted to assume it, marriage may be said to proceed from a civil contract between one man and one woman of the needful physical and civil capacity.'

" Again, in sec. 31, he says : ' though marriage, in law writings is generally denominated a contract, yet it is said to be more than a contract, and to differ from all other contracts.'

" In accordance with this is Judge Story's view of marriage in his *Conflict of Laws.* In sec. 200, he says, ' Marriage is not treated as a mere contract between the parties, subject as to its continuance, dissolution and effects to their mere pleasure and intentions. But is treated as a civil institution, the most interesting and important in its nature of any in society.'

" Again, in a note to sec. 108, he says, ' I have throughout treated marriage as a contract in the common sense of the word, because this is the light in which it is ordinarily viewed by jurists, domestic as well as foreign. But it appears to me to be something more than a mere contract. It is rather to be deemed an institution of society, founded upon the consent and contract of the parties ; and in this view it has some peculiarities in its nature, character, operation and extent of obligation, different from what belongs to ordinary contracts.'

" That eminent jurist, whose opinion has already been quoted, in an elaborate judgment, rendered in the case of *Lindo vs. Belisano,* 4 *Eng. Eccl. Rep.,* 373, says, ' The opinions which have divided the world, or writers at least, on this subject, are generally two. It is held by some persons that marriage is a contract merely civil ; by others, that it is a sacred, religious and spiritual contract, and only so to be considered. The jurisdiction of the Eclesiastical Court was founded on ideas of this last described nature; but in a more correct view of this subject, I conceive that neither of these opinions is perfectly accurate. According to the juster notions of the nature of the marriage contract, it is not *merely* either a civil or religious contract; and at the present time, it is not to be considered as originally and simply one or the other. It is a contract according to the law of nature, antecedent to civil

institutions, and which may take place to all intents and purposes, wherever two persons of different sexes engage by mutual contract to live together.'

" Such is marriage and the marital relation.  It is founded upon and grows out of a contract.  In the next place, what is necessary to make a contract?  As in all other contracts, the consent of the parties, for without that, there can be no contract; but when that is given, and mutually declared, the contract is made and the marriage relation supervenes, and no form of ceremony is prescribed by law to carry into effect the agreement of the parties.

" ' It is not unworthy of remark,' says Sir William Scott, ' that amidst the manifold ritual provisions made by the Divine Law-giver of the Jews for various offenses, and transactions of life, there is no ceremony prescribed for the celebration of marriage.'

" And it is equally true that none is prescribed by the common law, or our statutes in relation to marriage.

" Marriage, then, in its inception, by the common law, is a civil contract founded on the consent of the parties.

" ' Any mutual agreement between the parties to be husband and wife in *presenti*, especially where it is followed by cohabitation, constitutes a valid and binding marriage, if there is no legal disability on the part of either to contract matrimony :' *Rose vs. Clark*, 8 *Paige*, 574.,

" Marriage being a contract, is of course consensual, for it is of the essence of all contracts to be constituted by the consent of both parties.   *Consensus, non concubitas, faciat matrimonium*, the maxim of the Roman civil law, is, in truth, the maxim of all law upon the subject; for the *concubitas* may take place for the mere gratification of present appetite, without a view to any thing further; but a marriage must be something more; it must be an agreement of the parties, looking to the *consortium vita ;* and agreement indeed of the parties capable of the *concubitas*, for though the *concubitas* itself will not constitute marriage, yet it is so far one of the essential duties for which the parties stipulate, that the incapacity of either party to satisfy that duty nullifies the contract.

" Marriage being a civil contract, it is not necessary that it be solemnized by a person in holy orders, and in *facie ecclesiæ*. In the Roman Catholic Church, marriage is a sacrament; and

in countries where that religion prevails, and is established by law, marriages are required to be solemnized by a priest, and in the church; but it is not so here, for our statute enacts, that marriage licenses may issue, directed to any Judge, Justice of the Superior Court, or Justice of the Peace, as well as to Ministers of the Gospel.

" If the contract be made *per verba de presenti*, and remains without cohabitation, or if made *per verba the futuro*, and be followed by consummation, it amounts to a valid marriage in the absence of all civil regulations to the contrary, and which the parties (being competent as to age and consent) cannot dissolve, and it is equally binding as if made *in facie ecclesiæ*. There is no recognition of any ecclesiastical authority, in forming the connection; and it is considered entirely in the light of a civil contract. This is the doctrine of the Common Law, and also of the Court Law which governed marriages in England prior to the Marriage Act of 26 *Geo.*, 2d.

" The Supreme Court of the United States, *Jewell vs. Jewell*, 1 *Howard's Rep.*, 219, were equally divided in respect to the proposition in the above paragraph, and gave no opinion. 2 *Kent. Com.*, 7 *Ed.*, top *page* 52, *near* 87, *and note.*

" The same question came before the House of Lords, in England, in 1844, in the case of the *Queen vs. Millis*, reported in 10 *Clark and Finnelly*, 534.

" The question was, whether the marriage of the defendant Millis, who was a member of the established church, to a woman in Ireland by a Presbyterian minister, according to the form which was usual with that denomination, was valid?

"The question was referred by the lords to the Judges and Lord Ch. J. Tindal gave their unanimous opinion against the validity of the marriage, and held that, by the law of England, as it existed at the time of the Marriage Act, a contract of marriage *per verba de presenti*, was indissoluble between the parties themselves, and afforded to either of them, by application to the Spiritual Court, the power of compelling the solemnization of an actual marriage; but that such contract never constituted a full and complete marriage in itself, unless made in the presence and with the intervention of a minister in holy orders. The civil contract and the religious ceremony were both necessary to a perfect marriage by the common law.

" The lords who gave judgment were equally divided: Brougham, Denman and Campbell being in favor of sustaining the first marriage ; the Lord Chancellor, (Lyndhurst,) Cottenham and Abenger being of the opposite opinion.

" Chancellor Walworth considers the ancient common law doctrine to have been, that the marriage was invalid, unless celebrated *in facie ecclesia ;* but adds : ' The law on this subject, however, was unquestionably changed at the Reformation, if not before." *Rose vs. Clarke,* 8 *Paige,* 574.

" But the doctrine, that to give validity to a marriage, it is necessary that it be solemnized by a person in holy orders, has never obtained in any of the States of this Union.

"It is not necessary," says Judge Kent, (2 *Kent,* 53-87) ·that a clergyman should be present to give validity to the marriage, though it is doubtless a very becoming practice, and suitable to the solemnity of the occasion. The consent of the parties may be declared before a magistrate, or simply before witnesses, or subsequently confessed, or acknowledged, or the marriage may even be inferred from continual cohabitation and reputation as husband and wife, except in cases of civil actions for adultery, or in public prosecutions for· bigamy or adultery, when actual proof of the marriage is required.

" *Bishop on Mar. and Div. sec.* 167 : ' Assuming, then, that the contract *per verba de presenti,* or *per verba de futuro cum copula,* is at common law a complete marriage, we are next to seek for the rules of interpretation by which to determine whether, in a given case, a statute has altered the common law upon the subject.'

" Has our statute, in relation to marriages, changed the common law ? and is a marriage celebrated by any person, other than those to whom the statute prescribes that marriage licenses shall be directed, valid and binding in law ?

" Upon this·point, ' the leading rule, and one of great importance, will be found to be, that the marriage at common law is always good, notwithstanding the statute, *unless the statute contains an express clause of nullity.*"

" This," says Bishop, 'like most other principles of law, that may now· be deemed to be well settled, has struggled against some doubts, but it seems never to have been overruled, unless· we except a decision in Massachusetts.'

" In support of the rule, he refers to decisions in Vermont,

New Hampshire, New Jersey, Pennsylvania, North Carolina and Kentucky; and such is the rule in England, since the repeal of 26 *Geo.*, 2 *Ch.*, commonly called Lord Hardwicke's Act.

"The same rule is recognized in *Reeve's Domestic Relations*, p. 196, and enforced in a note at page 199.

"There is scarcely any principle of law better supported by the authorities than that which declares that a marriage not solemnized according to the provisions of the statute, in the mere matter of form, is a valid marriage. It will be first noticed, that most of these statutes impose a penalty upon the person assuming to join others in matrimony, who is not legally authorized, and that in other respects the statutes are merely directory. Now, it is a principle both salutary and well-settled, that the official acts of a person not duly qualified are valid as to third persons and the public, when the neglect of the qualification is punished by a mere penalty, and where the acts themselves are not in their nature void, or are not expressly made void by statute." 7 *Johns*, 554.

"The statute of 26 *Geo.*, 2, renders the marriage illegal and void, if not solemnized according to the regulations prescribed by the statute, but that statute is not, and never has been, of force in this State. Before its enactment, and since its repeal, the decisions in England were, and have been, in accordance with the doctrine already indicated ; that the decisions in England before the passage of the Act of 26 *Geo.*, 2 *Ch.* 33, held marriages to be valid, though they were not solemnized strictly according to the statutes, if there was no clause of nullity : *Rex vs. Brampton ;* 70 *East*, 232 ; 1 *Bl'k Com.*, 433.

"That such is now the rule in England, since the repeal of 26 *Geo.*, 2, see *The King vs. the Inhabitants of Birmingham*, 8 *Barn & Cres.*, 29 ; 15 *Eng. Com. Law Rep.*, 24.

"This case arose in relation to the settlement of a pauper. The pauper, Luke Smith, was married to Elizabeth Bratt, in the year 1826, by license, he then being a minor under the age of twenty-one years, and having his father then living, who did not consent to his said marriage.

"It was objected that his marriage was void under the new Marriage Act, *Stat.* 4 *Geo.* 4 C. 76, for want of the father's consent.

Askew *vs.* Dupree.

"The statute points out the mode in which licenses are to be obtained, and the matters to be sworn to by the parties or one of them ; and one of those matters, where either of the parties, not being a widower or widow, shall be under twenty-one years is, that the consent of the person or persons, whose consent to such marriage is required under the provisions of the Act, has been obtained thereto.

"The statute specifies who shall have power to consent—the father, if living, or the guardian, if there be one—and proceeds : ' and such consent is hereby required for the marriage of such party so under age, unless there be no person authorized to give such consent.'

"The Court of King's Bench, Lord Ch. J. Tenterden delivering the judgment, held the marriage to be valid, on the ground that ' the language of the statute is merely to *require* consent; it does not proceed to make the marriage void if solemnized without consent.'

"' One of the most frequent forms,' says *Bishop on Mar. and Div.,* sec. 171, ' in which this question arises is, where certain persons are forbidden to solemnize the marriage, or those who are authorized are forbidden to exercise the authority in any other method than the one prescribed, and the violators of the law are subject to punishment. The rule that a marriage in disregard of such penal prohibition is good, seems to be universally acknowledged.'

"Again, sec. 173: 'There is no particular form of words essential to the solemnization of marriage, unless made so by statute. It is sufficient if the proper person, as minister or Justice, be present, and cognizance of the mutual engagement of the parties to assume the marital relation. But if such person do not consent to act in his official capacity, and do not so act, though he be present, and witness their undertaking, it has no other effect than if witnessed by an unauthorized person. This defect would not, however, vitiate the marriage, unless the statute contained an express clause nullifying all marriages not celebrated by such official person.'

"The statute of New Jersey, in relation to marriages, declares, ' that every Justice of the Peace in that State,' every ' stated and ordained minister of the Gospel,' and every 'religious society according to its rules,' shall be empowered to solemnize marriage.

" Justice Ford, in commenting upon this statute in *Pearson vs. Howey*, 6 *Halstead*, 20, said : 'Suppose this Act had gone to the whole extent of declaring that *no other* person or persons should solemnize marriages, except those mentioned in it, such persons would commit an offense against the Act by solemnizing marriages, for which they might be punished, but still, the marriage contract between the parties themselves would remain valid.   During the Commonwealth of England, Parliament passed a law *requiring* all marriages to be solemnized by Justices of the Peace; yet, a marriage solemnized by a clergyman was holden by all their Courts to be valid, as between the parties, though the statute prohibited such priest from doing it; and for the act he was exposed to punishment.   Our Act empowers an ordained Minister of the Gospel to solemnize marriages; but suppose a Minister of the Gospel should do it before he is ordained, can any person believe that the marriage itself would be invalid, and that either of the parties might go away at any time afterwards and contract a new alliance?   Our statute prohibits Ministers of the Gospel from solemnizing the marriage of persons under age, without the consent of parents or guardians, under a very heavy penalty; but this does not render the marriage void; on the contrary, it remains sacred and inviolate, which is the very thing that aggravates the offense.'

" 2 *Kent*, 91 :  Such 'is the doctrine judicially declared in New Hampshire, Pennsylvania, and Kentucky, and by statute in Alabama and Vermont; and the marriage is held valid as to the parties, though it be not solemnized in form according to the requisitions of their statute law.'

" This doctrine has been virtually recognized by the Supreme Court of this State, in the case of *Park et al., vs. Barron*, 20 *Ga.*, 702—Judge McDonald delivering the opinion.

" It is conceded that the precise point before the Court .in that case, and adjudicated by it, is not identical with the question now under consideration, but the Judge who delivered the opinion of the Court recognized the general principle which has now been laid down.

" The facts of that case were these :   James Barron intermarried, and was divorced from his first wife at her instance, he being the 'guilty party.'   He afterwards married again, his first wife being still alive; by both he had children;

after his death, his children were entitled to a distributive share of the estate of A. Barron, a brother of James Barron, who died without issue after James Barron died. The contest was between the children of James Barron by his first wife, and those by his second. The issue of the first marriage claimed the whole distributive share which would have gone to their father, had he been living, contending that the second marriage was void, and the issue thereof bastards.

" James Barron having been the party whose improper or criminal conduct authorized the divorce, was prohibited from marrying by the Act of the General Assembly of 1806, during the life of the woman from whom he had been divorced. By marrying the second time, he subjected himself to the pains and penalties against bigamy ; but the second marriage is not declared by that Act to be void, but is made indictable and punishable. The Court held the issue of the second marriage legitimate, and entitled to take, representing their father.

" It is only necessary to refer to so much of the published opinion, as goes to sustain the general principles of law under consideration.

" Barron, whose misconduct led to a divorce, was prohibited from marrying, under a penalty ; but the marriage is not declared void by the Act which prohibits him from marrying.

" The first Marriage Act in England was 26 *George* 2d. That Act was never in force in this country. It expressly provides that it shall not extend to marriages solemnized beyond seas. There is a marked difference between that statute and our own as respects the solemnization of marriages. That Act not only inflicts a severe penalty on persons who solemnize marriages contrary to its provisions, but it also declares all marriages thus solemnized void. Our statutes inflict a penalty, but do not declare the marriage void.

" Barron's marriage is the marriage of a person prohibited from marrying under a penalty, the statute not declaring the marriage void. If it be not a good one, it should be classed according to the analogies of the English law with marriages that are voidable.

" Marriages within certain degrees of kindred are, in Eng-

land, prohibited by both the canon and statute law. They are, therefore, unlawful; and yet, they are not void, but voidable only. 1 *Eccl. Rep.*, 73. If not pronounced void in the life time of the parties, they are valid to all civil purposes. *Ib.*, 168. If such marriages are prohibited by the statute law of England, why are not the parties who enter them in violation of the law, indictable for committing an act forbidden by a public law? The common law Courts, however, have never interfered, and have left such cases to the undisturbed jurisdiction of the Ecclesiastical Courts. If the Courts there abstain from taking cognizance of such cases, the Courts here may well say, that the public policy to which the Courts have referred by declaring the contracts void, which are prohibited by inflicting statutory penalties on those who enter into them, whether the contracts are declared void or not, does not require the enforcement of that principle so as to set aside the actual marriages, which the legislature has not pronounced void. A public policy which looks to the protection of the innocent and unoffending, to the peace of families, and the welfare of society, would seem to us to forbid the inference of a purpose on the part of the legislature, which they have not expressed, that the marriage of a party, against the prohibition of the Act of 1806, should be void.

"If this be the law applicable to a marriage prohibited by statute, but not made void by statute—*a fortiorori*—does it apply to a marriage not solemnized by either of the persons authorized to join persons in matrimony, if it be not rendere void by the statute for the want of that formality.

" It is true, that this rule of construction is different from that ordinarily applied to contracts, but it is required by considerations of public policy.

" For obvious reasons connected with the welfare of society, the law is more tender of nuptial contracts than ordinary contracts which relate merely to property and the ordinary dealings among men.

" Marriage contracts are, by the common law, excepted from the rules which govern ordinary contracts. 20 *George*, 704.

" *Bis. on Mar. and Div.*, sec. 170: 'It was admitted by Dr. Sushington, that the rule of interpretation we are considering is not in accordance with the constructions which

some other Acts, relating to other subjects have received; but it must always be remembered,' he said, ' that marriage is essentially distinguished from every other species of contract, whether of legislative or judicial determination; that this distinction has been universally admitted; that not only is all legal presumption in favor of the validity and against the nullity of marriage, but it is so on this principle, that a legislative enactment to annull a marriage *de facto*, is a penal enactment, not only penal to the parties, but highly penal to the innocent offspring, and therefore to be construed according to the acknowledged rule most strictly.'

" This indicates the reason for the rule, and it is one which has been already adverted to. It is founded upon public policy.

" After the marriage relation is entered into, it is then considered in the light of a civil institution, in which the State itself has an interest, as well as the parties. And the interest of the State is that these contracts shall be permanent, and not revocable at the will and pleasure of the parties; to prevent promiscuous concubinage between the sexes; that parents may be held responsible for the support, maintenance and education of their offspring, and that the legitimacy of their offspring may be known and established beyond dispute, and the offspring of a marriage should never be bastardized, except in cases in which the law declares the marriage to be void *ab initio.*

" This being the rule, that a marriage at common law is always good, notwithstanding the statute, *unless the statute contains an express clause of nullity*, it only remains to inquire, whether our statute regulating marriages declares such a marriage as the one under consideration void for want of conformity to the statute?

" The 6th sec. of the 3d art. of the Constitution of Georgia provides that the Clerk of the Court of Ordinary may grant marriage licenses, and the Act of 1799, passed to carry that section of the Constitution into effect, enacts in the 3d section, that, ' the Clerks of the Courts of Ordinary in the several counties shall grant marriage licenses directed to any Judge, Justice of the Superior Court, Justice of the Peace or Minister of the Gospel, (and by a subsequent statute to any Jewish Minister, or other person authorised to perform the marriage ceremony between Jews,) to join

persons of lawful age, and authorised by Levitical degrees to be joined together in matrimony; and where such persons intending to marry shall have the banns of marriage published three times in some public place of worship, it shall be lawful for such Judge, Justice of the Superior Court, Justice of the Peace or Minister of the Gospel, being duly certified thereof, to marry the persons whose banns have been so published; and any person marrying any couple without such license, or publication of such banns, shall forfeit $500 00, to be recovered for the use of the academy of the county, by action of debt, in any Court having cognizance thereof, in the name of the commissioners of such academy.  *Cobb's Dig.,* 282.

" The 28th section of the Penal Code enacts, that, ' If any Minister of the Gospel, Judge, Justice of the Superior Court, or Justice of the Peace, shall join together in matrimony any man and woman without a license, or publication of banns, as provided by law, or where either of the parties within his own knowledge shall be an idiot or lunatic, or subject to any other disability which would render such contract or marriage improper and void, such Minister, Judge, Justice of the Superior Court, or Justice of the Peace, shall be guilty of a misdemeanor, and on conviction, shall be fined in a sum not less than $100 00 nor more than $500 00, which said fine, when collected, shall be paid over to the Justices of the Inferior Court of the county where the offense was committed, for the use of the Poor School Fund of said county.' *Cobb's Dig.,* 818.

" These are all the statutes which have been enacted by the legislature of this State for the regulation of marriages. In neither is a marriage declared void, if not solemnized by a Judge, Justice of the Superior Court, Justice of the Peace or Minister of the Gospel—the only penalty imposed is upon the officer or minister who may marry a couple without a license, or the publication of banns; no penalty is imposed upon an unauthorised person who may perform the marriage ceremony, but the penalty is for joining together *in matrimony* any man and woman without a license, or publication of banns, as provided by law.    If Mr. Buckner was not a minister at the time he performed the ceremony, but had a license authorising James F. Dupree and Uriah E. Askew to be joined together in matrimony, he is not liable to the

penalty prescribed by the statute.    The object and intention of the statute is to prevent clandestine marriages, and this object is affected by requiring the publication of banns or the issuing of marriage licenses; either gives publicity to the intended marriage; the publication of the banns does it effectually, and when a marriage license issues, any person interested has a right to know the fact from the Ordinary ; for his official acts are not a matter of secrecy.    But our statute does not say·that a clandestine marriage shall be void ; but it only imposes a penalty upon those who may celebrate marriages without the requisites which are necessary to give them publicity.

" If marriage be a civil contract, consummated by the consent of the parties, freely and voluntarily given, the bare fact of its being clandestine, and being entered into and solemnized without the usual requisites to give it publicity, does not *ipso facto* render it void, in the absence of any statutory provision to that effect.

" The advantage," says Chancellor J. Woodbury, in 2 *New Hamp.*, 277, ' of an open and notorious solemnization of the marriage contract is no doubt advantageous to the interest of society, and it was for the purpose of giving it a greater degree of notoriety, that these statutes were enacted ; but even without these forms, for they are nothing more, where a contract which changes so thoroughly the relations of the parties to the community, is first executed by them with deliberation, and afterwards consummated by cohabitation, it should not be lightly endangered, and everything done disannulled.'

"So in Kentucky, where a statute prohibited the celebration of marriage without a license, the marriage was held to be valid, though no license was taken out.    *Cannon vs. Alsbury*, 1 *A. K. Marshall*, 76.

" From the premises which have been laid down, the conclusion is inevitable.

" In every aspect in which the case before the Court can be considered in relation to our statutes regulating marriages, under long established rules of law, and enforcing a public policy which regards the welfare of society and the peace of families, the marriage of the complainants, James F. Dupree and Uriah E. Askew, must be held to be valid and binding."

I would merely add, that it would constitute an act of un-

pardonable pedantry to attempt any further review of the authorities upon this question.    The law of the case has been exhausted by *Bishop on Marriage and Divorce* and other text writers, and in the adjudicated cases in England and this country.

*See Dalrymple vs. Dalrymple*, 4 *English Ecc. Report*, 485; *The Queen vs. Millis*, 10 *Clark & Finnelly*, 534; 6 *Halsted's N. J. Rep.*, 12; 2 *New H. Rep.*, 268; 4 *Johns*, 52; 1 *Hill N. Y. Report*, 270; 8 *Paige*, 574; 4 *Const.*, 230; 6 *Binn*, 405; *A. K. Marshall*, 368; 2 *Vermont*, 157; 12 *Ib.* 396; 20 *Ib.*, 382; 1 *Yerg.*, 177; 2 *Ib.*, 59; 6 *Alabama*, 765; 1 *Har. & McH.*, 152; 2 *Cal. Report*, 503; 1 *Louisiana*, 68; 4 *Ib.*, 347; 6 *Ib.*, 463.

I would remark that the case in 10 *Clark & Finnelly* occupies 374 pages of the volume!

The conclusions to be deduced from the whole matter are these : That marriage is founded in the law of nature, and is anterior to all human law ; that in society it is a civil contract; that if the contract is *per verba de presenti*—that is, I take you to be my wife, and I take you to be my husband—though it be not consummated by cohabitation, or if it be made *per verba de futuro*, and be consummated, it amounts to a valid marriage, in the absence of all municipal regulations to the contrary ; and that notwithstanding there be statutes directing a license to issue, as in this State, and inflicting a penalty on any minister or magistrate who shall unite the parties in wedlock, without such license, yet, in the absence of any positive enactment, declaring that all marriages not celebrated in the prescribed form, shall be void ; a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enactment, is still a valid marriage.

And this is the opinion of Chancellor Kent, 2 *Com.*, 90-91 ; *Judge Reeve, Dom. Rel.*, 2 *9d.*, 1857; *note page* 199 ; *and Prof. Greenleaf*, 2 *Ev.*, 513, *and notes.*

In Massachusetts it is provided by statute, that no persons but Justices of the Peace and Ministers of the Gospel shall solemnize marriages; and they only in certain specified cases.    And in *Milford & Worcester*, 7 *Mass. Rep.*, 48, it was held, that the parties themselves were precluded from

solemnizing their own marriage, and that a marriage by mutual agreement, not according to the statute, was void.

But this opinion, evidently a departure from the general doctrine, and distasteful to the public sentiment, was overruled in the subsequent case of *Parben vs. Harvey*, 1 *Grey's Rep.*, 119.

For the policy of this law we are not responsible. It is for the legislature to change it, should it see fit to do so. In this State, no marriage, within our knowledge, has been declared a nullity because the statutory regulations were not complied with, and while the law inflicts penalties upon the celebrator, it has cautiously abstained from interfering with the marriage itself.

For myself, I approve the law as it is. True, it will be sometimes abused. What human institution is not? Rarely, however, will the parties forego the benefits resulting from a compliance with the statutes. It adds so much both to the respectability as well as the security of the contract.

I have never known of a self-solemnized marriage. But suppose such should occur : better, far, for the parties, especially the female, that the law should be as it is. Her honor is saved, and this is worth more than everything, even life itself. All other contracts may be rescinded, and the parties restored to their former condition ; marriage cannot be undone.

Why does this law, in utter disregard of what seems to be the usual protection and restraint, thrown around the inexperience and imprudence of infancy, allow infants—the male at fourteen and the female at twelve—to enter into the binding contract of marriage? It is at this age the sexual passions are usually developed, and the law, with a wise forethought, looking beyond exceptional cases, and to the general interests of society, to guard against the manifold evils which would result from illicit intercourse, declares even infants capable of forming this relation.

The greatest amount of domestic discontent and discord I have ever known, was produced by a marriage celebrated under a license, regularly issued, and by an officiating magistrate duly authorised to perform the ceremony.

But, I repeat, let our rulers take action upon this most difficult and delicate subject, if, in their judgment, the good' of the community demands it. It is a disgrace to the civilization of the age to condemn Courts for the real or imaginary defects of the law.