DALE *v.* THE STATE.

1. The words "or offense," in section 4665 of the code, are a part of the law. Though these words were introduced by the codifiers, they have been adopted as law by the constitutional conventions. The statute of limitations would not begin to run in favor of the defendant until the fact of his plural marriage became known.

2. In a trial for bigamy, the first marriage may be established by proof of a marriage in fact celebrated in another State of the Union, followed by cohabitation in that State and the birth of children. These facts will authorize the jury to infer the validity of the marriage even though the marriage laws of that State be not affirmatively proved, there being nothing in the evidence tending to show that the marriage was not regular and comformable to law.

3. It was not error to allow the brother of the alleged first wife, after he had testified, to remain in the court-room to aid the solicitor-general, at the latter's request, in conducting the prosecution,

especially as such person was not again placed upon the stand and further examined as a witness.

4. Where the defendant voluntarily goes to trial relying on the promise of a witness to appear, and knowing when he announced ready that the witness was not present, it is no ground for a new trial that such witness did not appear and that defendant did not have the benefit of his testimony. That the absence of the witness was caused by sickness makes no difference.

5. Some of the newly discovered evidence is not merely cumulative, and the matter of it is sufficiently important to render a new trial proper.

6. Where the question of personal identity and the fact of *alibi* are virtually the same defence, the omission of the court to instruct separately on *alibi* is not error.

7. The remarks made by State's counsel in their argument, complained of in the motion for a new trial, were not necessarily improper.

February 1, 1892.

Criminal law. Statutes. Bigamy. Evidence. Practice. Charge of court. Before Judge Maddox. Paulding superior court. January adjourned term, 1891.

Reported in the decision.

J. A. Anderson, Speairs & Roan, I. F. Thompson, W. E. Spinks and W. K. Fielder, for plaintiff in error.

A. Richardson, solicitor-general, *contra*.

Simmons, Justice.

1. In this case there are two bills of exceptions. In the first of these the defendant excepts to the denial of his motion in arrest of judgment, the ground of the motion being that the offense was barred by the statute of limitations, and that this appeared on the face of the indictment. The indictment was a special presentment by the grand jury of Paulding county, found at the January term, 1890. It was against J. O. H. Nutall *alias* W. R. Dale, and charged that in 1867, in Anson county, North Carolina, he did lawfully marry Emma T. Horton and had her to his lawful wife, and afterwards, whilst he was so lawfully married to her, in December, 1884, in Paulding county, Georgia, he did knowingly marry

and take to wife Effie Smith, said Emma T. being then
alive and his lawful wife, of which fact he had full
knowledge; that his real name was and is J. O. H. Nutall;
that he came to Paulding county under the assumed
name of W. R. Dale, and under such assumed name was
married to Effie Smith, and has given out his name to
the public since said time to the present as W. R. Dale;
" and that the aforesaid offense was unknown until the
1st day of October, 1889." The defendant contends that
no exception which prevents the running of the statute
is averred, and that the allegation that the offense was
unknown until October 1, 1889, constitutes no excep-
tion, as the words " or offense " appearing in the second
proviso of section 4665 of the code, were so placed by
error of the codifiers, and are not part of the law.

The section here referred to, after prescribing that in
all felonies of this class " the indictments shall be found
and filed in the proper court within four years next
after the commission of the offense, and at no time
thereafter," provides that "no limitation shall run so long
as the offender or offense is unknown." In the statutes
from which this section was taken, it was provided that
the limitation should not run so long as " the offender "
was unknown, but the words " or offense " did not ap-
pear in this connection until introduced by the codifiers
into the first edition of the code. Acts 1855–6, p. 236;
Acts 1859, p. 50; Code of 1863, §4551. The section as
framed by the codifiers has remained unaltered in each
revision of the code. Code of 1868, §4571; Code of
1873, §4665; Code of 1882, §4665. It is evident that
the words thus added were intended to form a part of
the law and to alter or amend the original act, and their
introduction is not to be treated as a mere casual mis-
take or error. We hold, therefore, that they were
adopted as law by the constitutional conventions. *Phil-
lips* v. *Solomon*, 42 *Ga.* 195; *Miller* v. *Southwestern R.*

*Co.*, 55 *Ga.* 143.   See also *City of Atlanta* v. *Gate City Gas Light Co.*, 71 *Ga.* 119.   It follows that the judgment complained of in the first bill of exceptions must be affirmed.

2. The second bill of exceptions assigns as error the overruling of the defendant's motion for a new trial upon the grounds therein set out.   One of the grounds mainly relied upon was the fourth, which complains that the evidence was insufficient to show a marriage valid under the laws of North Carolina.   It is also complained of as error, that the court instructed the jury that if they were satisfied from the evidence that a marriage in fact was contracted between the defendant and Emma T. Horton at the time named in the indictment, and he afterwards lived with her and acknowledged her to be his wife, this would be sufficient to authorize them in finding that he was legally married to her.   It was contended that as marriage is regulated in North Carolina by statute, it must be shown that the statute was complied with.

There was evidence of a marriage ceremony in North Carolina, in the year 1867, between the defendant and Emma T. Horton; her brother, George P. Horton, testifying that the defendant was Nutall, and that he saw him married to Emma by a minister, at Wadesboro in that State, at her father's house, in the presence of the family and friends.   There was also evidence that the marriage was followed by cohabitation of the parties, in the same State, for a number of years, resulting in the birth of several children.   The witness Horton testified that the records of the marriage were destroyed.   He also testified that marriage was regulated in North Carolina by statute; but there was no evidence as to what the statutory requirements were, or that there was any failure to comply with them.   This evidence was sufficient to establish the marriage as *prima facie* valid.

Where a marriage in this State is in question, upon a trial for bigamy, proof by a witness who was present, of a marriage in fact, is sufficient, without evidence as to the authority of the person officiating, or of compliance with statutory requirements. *Murphy* v. *The State*, 50 *Ga.* 150. By the common law and the law of this State, a mutual agreement to be husband and wife, by parties able to contract, followed by cohabitation, is recognized as a valid marriage. *Askew* v. *Dupree*, 30 *Ga.* 173 ; *Clark* v. *Cassidy*, 64 *Ga.* 662. The proof in this case showing a marriage valid under the common law or the law of this State, and there being no evidence as to the statutory requirements of North Carolina, or of any failure to comply with them, the jury were authorized to infer that the marriage was valid under the laws of that State. There is some conflict in the decisions of other courts on this subject, some holding that the prosecution must prove not only a marriage in fact, but a marriage valid under the law of the State in which it took place ; but we think the better view is that the validity of the marriage will be presumed, in the absence of evidence tending to show that it was not regular and conformable to law. Mr. Bishop, in his New Commentaries on Marriage, Divorce and Separation (1891), vol. 1, §1115, says : " Whenever, in a proven transaction in any foreign country, two apparently marriageable persons are shown to have entered into any form of solemnization or contract which comprehends a present undertaking to be husband and wife, and nothing appears to cast discredit on the proceeding, the foreign law should be presumed *prima facie* to make them married." In Wharton on Criminal Evidence, §169, it is said : " In any view, the *judex fori* will presume, until the contrary be proved, that a marriage abroad was in conformity with the *lex loci contractus.*" The American and English Encyclopædia of Law, vol. 2, p. 192, title Bigamy, says : " A

marriage sufficient in form to be valid under the laws of the State where the offense is prosecuted, though celebrated in another State, will be presumed to be sufficient under the laws of that State, when there is no evidence to the contrary." Among the cases which sustain this view, see the following: State *v.* Nadal, 69 Iowa, 478, 8 Crim. Law Mag. 730 (1886); Dumas *v.* State, 14 Tex. App. 464, 46 Am. Rep. 241; State *v.* Patterson, 2 Ired. Law (N. C.), 346, 38 Am. Dec. 699; Hutchins *v.* Kimmell, 31 Mich. 126, 18 Am. Rep. 164 (1875). The last of these cases, it will be seen, is of later date than that of People *v.* Lambert, by the same court, 5 Mich. 349, 72 Am. Dec. 49 (1858), which seemed to be the case mainly relied on by counsel for the plaintiff in error.

3. It is also complained that the court allowed the witness Horton, over the defendant's objection, to remain in the court-room after he had testified for the State, to assist the solicitor-general in conducting the prosecution, that officer having stated that he needed Horton's assistance, but his name not being marked upon the indictment as prosecutor. This was not error, especially as Horton was not again placed upon the stand and examined further as a witness. *Thomas* v. *State*, 27 *Ga.* 288; *Carson* v. *State*, 80 *Ga.* 170.

4. Other grounds of the motion are based upon the loss of the testimony of certain witnesses, who were subpœnaed and had promised to attend the trial and had failed to do so. It was alleged that one of these witnesses had failed to be present because of a misunderstanding as to the time of trial, and that the other was detained by sickness, and that counsel had gone to trial relying upon their attendance, and "so stated to the court in announcing ready." We think where the defendant announces ready and voluntarily goes to trial, knowing that a witness is not present, it is not ground for a new trial that the witness did not appear and that the defendant did not have the benefit of his testimony.

5. The next ground is based upon the newly discovered testimony of Mrs. McCraney and J. H. Hales. This testimony, we think, is sufficiently important to render a new trial proper. It is not merely cumulative, coming as it does from witnesses who did not testify at the trial, and relating to facts as to which there was no evidence. Although bearing upon the question of identity, it relates to special marks and peculiarities of person which these witnesses testify were present in Nutall and not present in Dale, such as a broken tooth, a soot scar, etc., as to which no testimony had been introduced upon the trial. None of the witnesses on the trial gave any special marks by which they identified the defendant as Nutall, beyond his general appearance and a stoop about the shoulders in walking. It appeared from the affidavits in support of this ground, that Mrs. McCraney was intimately acquainted with J. O. H. Nutall and his wife, mother and children in North Carolina, from 1873 to 1880, and lived in the house with him and his family for five months of 1874. During that time he was once holding some beef which she was cutting up, and she accidentally cut his finger badly at the point where it joined the hand, and soot was used to stop the flow of blood, with the effect that the soot was plainly visible after the cut healed. One of his upper front teeth "was either out or so broken as to be certainly and easily noticed, especially when he smiled, by those familiar with him." Mrs. McCraney has seen and talked with the defendant; has examined his hand for the scar, and finds neither the scar nor any trace of the cut; and has examined his teeth, and finds both his natural teeth in his mouth and in good condition; and is thoroughly satisfied that, while there is a very remarkable resemblance between him and Nutall, they are not one and the same man, but are different men. She was unwilling to testify in this case, but after the trial she

casually mentioned some of the above facts to a friend without intending for him to speak of the matter; but he did inform defendant's counsel of it, and thus led to the above disclosure. He mentioned to the counsel the scar, but not the broken or missing tooth. This counsel requested one of his associate counsel to see Dale and explain to him that a lady claimed to be able to identify him as being or not being Nutall, and to get him to name a time when he could come in and be seen by her; also to look for the scar but to say nothing to Dale about it. The appointment for the meeting of defendant and Mrs. McCraney was made, and they met at her house in the presence of one of his counsel; and the result of the meeting was the procurement of her affidavit. Subsequently she informed the counsel in regard to Hales, and a meeting between defendant and Hales was brought about. Hales said he had fully expected to see and identify Nutall, but on seeing the defendant, was positive that he was not Nutall; he had frequently seen him on the street without taking him to be Nutall. Hales lived in North Carolina during and between the years 1866 and 1877, except a part of the time in 1871, 1872 and 1875. During the two or three later years of his residence there he became acquainted with J. O. H. Nutall and saw him frequently, and remembers him so well as to be positively certain to know him if he were to see him again. He is positive that while there is a striking resemblance between Dale and Nutall, there are some points of difference that confirm him beyond all doubt that they are not one and the same. Dale's under jaws are entirely too broad for Nutall's; Nutall was at least two inches higher than Dale; and there is a slight difference in the appearance of their foreheads, besides a slight general dissimilarity in their appearance. The character of Hales and Mrs. McCraney for veracity is supported by divers affidavits. Defendant's counsel,

until after the trial, were fully impressed with the belief that they could get no testimony from North Carolina for their client without his going there, which was thought impracticable or unadvisable for reasons stated in the affidavits. They did not know of the existence of Mrs. McCraney or of her testimony, or of the testimony of the witness Hales or of the fact that he had lived in North Carolina, until after the trial. " It appeared to deponents, from the number of North Carolinians in Atlanta and coming from North Carolina to testify against the defendant, that the State's witness Horton and his friend had found and summoned all who were accessible who had ever known Nutall. So that counsel were not intentionally or knowingly guilty of any negligence in failing to discover the testimony of these witnesses before the trial."

We think the ends of justice would be promoted by allowing the defendant an opportunity to avail himself of this testimony. The case as presented to the jury was a very close one, and probably if this testimony had been before them the verdict would have been different. The conviction was based upon the testimony of persons who resided in North Carolina and had known Nutall as a resident of that State, but had lost sight of him for several years, and did not see him again until in this State they recognized the defendant as the same person. The defendant, to show that he was not Nutall, sought to establish an *alibi*, a number of witnesses, some of whom were very positive in their testimony, being introduced to show that the defendant did not reside in North Carolina during the period testified to by the State's witnesses, but during that time resided in this State, where he was not at any time known as Nutall. The testimony of these witnesses is controverted only as to the fact of identity ; it is uncontradicted that they did know a person corresponding in appearance and

other respects to the defendant, and ·known as Dale, who resided in Georgia at the time Nutall was shown to have resided in North Carolina, and that they were confident the defendant was the same person. In this condition of the evidence, the newly discovered testimony is calculated to throw additional light upon the case and might legitimately produce a reasonable doubt of the defendant's guilt. No lack of diligence appears on the part of the accused or his counsel in the procurement of evidence. It is not to be assumed that he knew anything of Nutall or his personal characteristics, so as to be able to direct attention to points of difference between Nutall and himself; and his situation as a prisoner or accused person, without the ability or the means, perhaps, to visit another State or to procure the attendance of witnesses beyond the process of the court, might well have rendered it impracticable to obtain evidence from persons who had known Nutall, that he was not the same person. As we have already said, this testimony is not merely cumulative. Cumulative evidence is defined to be " additional evidence offered to establish a fact to which witnesses have already testified." It does not necessarily include all evidence which tends to establish the same ultimate or principally controverted fact. 1 Abbott, Law Dic. 331, and cases cited. Although the defendant's evidence as to *alibi* related to the same general question, to wit that of identity, this newly discovered testimony, dealing as it does with the comparative appearance and characteristics of Nutall and the defendant, is wholly different in its nature; and although there was other evidence on the latter subject, this testimony, especially that of Mrs. McCraney, as we have shown, relates to distinct facts as to which there was no evidence on the trial. It therefore cannot be regarded as merely cumulative within the meaning of the rule as to new trials.

v 88 36

6. It is assigned as error that the court failed to instruct the jury on the subject of proof of an *alibi* as a defence, and as to the force and effect to be given to testimony fully or partially establishing an *alibi*. We think this defence was sufficiently covered by the charge of the court. Besides, it does not appear that the judge was requested to charge anything on this subject; and at the close of the charge as given, he inquired of counsel whether there was anything else they would have charged, and counsel on both sides answered in the negative.

7. The last special ground for new trial is based upon the alleged misconduct of counsel for the State in the opening argument, in saying to the jury, after describing the travels and changes of residence of the defendant, "And then about the close of 1880, Dale turned up in Dallas, and you know his history here as well as I do"; also in saying, in his concluding argument, that one of the witnesses for the defendant, in testifying, had "lied from stem to stern." These remarks are not necessarily ground for a new trial. It does not appear that the statement "you know his history here as well as I do" referred to anything outside of the evidence and prejudicial to the defendant; and whatever may be said as to the impropriety of the remark that the witness had "lied from stem to stern," it would not entitle the defendant to a new trial. Counsel for the defendant, so far as appears, did not object to either of the statements when made, and did not call the attention of the court to them; and the judge in his charge was careful to guard the jury against the effect of any improper statements of counsel, referring specially to the remark last quoted and instructing them that it was improper, unless the evidence showed it to be true, and that the guilt or innocence of the prisoner ought to appear from the evidence, and not from the statement of the counsel either for or against the defendant.

8. Holding as we do that a new trial is proper, for reasons already stated, we need not consider the general ground that the verdict is contrary to the evidence.

The judgment of the court below refusing a new trial is                                                    *Reversed.*