## 24367. ALLEN v. THE STATE.

DECIDED MARCH 26, 1935.

*James R. Venable, Robert McGinley, J. B. Wood,* for plaintiff in error.

*John A. Boykin, solicitor-general, J. W. LeCraw, E. A. Stephens,* contra.

MACINTYRE, J. The indictment charges that Lena Bell Allen committed murder by shooting Will Allen with a shotgun. The jury found the defendant guilty of voluntary manslaughter, and her motion for a new trial being overruled, she excepted.

The shooting occurred during the early part of the night, in a

room occupied by the defendant and the deceased. There was no eye-witness to the tragedy. In her statement to the jury the defendant said that she and the deceased "got to fussing," and she told him that she was going to bed, and pulled off her shoes and dress; that the deceased, who had been drinking, said she had no sense, and "kept quarreling and fussing;" that he then cursed her vilely, and said that when he gave her money she didn't give it back to him; that she replied, "When I gave you my money you didn't give it back to me;" that the deceased said: "If you don't, I will cut your God damned heart out," and started towards her with a knife in his hand; that she reached behind her and "got the gun, and held the gun up, and told him not to come any further;" that "he come towards me with the knife, and the gun said boom  .  .  , and the light went out;" that she struck a match, and the deceased was lying on the floor in front of the bed, shot in the head, with a knife in his hand; and that "when I raised the barrel of the gun it shot without my knowing it." Shortly after the shooting, the deceased was found dead, lying on the floor near the door, with a knife in his left hand. The evidence was uncontradicted that he was right-handed. The knife had a wooden handle and a blade about five or six inches long. According to the testimony of an officer, the defendant described the homicide to him substantially as she did to the jury.

We are satisfied that the evidence supports the verdict of voluntary manslaughter, and we hold that the court did not err in overruling the general grounds of the motion for a new trial.

It appears from the first special ground that the witness Ollie Watts testified substantially as follows: "On the night he was killed they [the defendant and the deceased] were in the room before the shot was fired.  .  .  . I heard them arguing first as usual, and he asked her for his clothes, he was going to get a room somewhere; and she wouldn't give him his clothes, and he asked for the money,. and after that, about three or four minutes, the gun fired.  .  . I heard that arguing going on in there, I guess about twenty-five minutes—they didn't argue very long.  .  . When he asked for his clothes she said she was not going to give him his clothes. He said: 'Just give me my money and I will go across and get a room.' And she said she would not give him his money. I didn't hear any scuffling going on, not a thing. I didn't hear

anything else said before the shot, after he asked for the money." The ground then states that on cross-examination the witness, Ollie Watts, testified as follows: "Lena Bell didn't have but one room, and I haven't got but one. I knew her by the name of Lena Bell Allen. That is what she was called. I knew him as Will Allen; I never heard any one call him Bridges, I didn't know him as Bridges at all. They were living there as husband and wife; they might have been married, I don't know. I guess they lived as husband and wife, I don't know. I called her Lena Bell." Counsel for the movant made the following motion: "We move to exclude the testimony of this witness as to anything she heard as between husband and wife. She said she heard certain statements between the two, and she has testified that she knew them as husband and wife, and the law recognizes common-law marriages." The court overruled this motion.

Ella Bridges testified, that the deceased was her son, was twenty-three years old, and was single; that her son had been living with the defendant about a year; that witness did not know whether or not they were living together as man and wife; that three weeks and one day before the homicide the defendant told witness that she was going to kill the deceased "if he messed with her;" and that the deceased "came home after she threatened to kill him, and was there for a few weeks, and she killed him."

Ollie Watts testified, that she and her family occupied one room in the house where the homicide occurred, and the defendant occupied another room in that house, and "Will Allen, or Will Bridges, stayed with her;" and that they did not come there at the same time, but that "she moved into the house by herself," and "Will came about a month after she moved in there."

Tom Watts, the husband of Ollie Watts, testified as follows in regard to what he heard in the room where the homicide was committed: "I had gone to bed. . . I heard them arguing, and she said: 'You hit me last Saturday night, and you had better not hit me this Saturday night.' Then . . he asked her to give him his money back and he would go and get a room. She said: 'I am not going to give you nothing back, you didn't give me back mine when I gave you mine.' It was about ten or fifteen minutes after that before I heard the shot. In the meantime they kept on quarreling, and I heard her say, 'it is loaded.'" On cross-exami-

nation Tom Watts testified: "I knew this boy as Allen White; that is all the name I knew him by; I didn't know him by any other name. We call his wife Lena. They lived there as husband and wife, I reckon; they live right next door to us."

We next quote from the defendant's statement to the jury as follows: "He came to my house, and he had been staying there a good while. I met him out there one day. I was going up town . . and went down to catch the car, and when I got on the car he did too, and he come to my home and left a bottle of medicine. He came to my home, and he said to me he thought he would stay around there. . ."

It appears from the learned and comprehensive discussion of marriage in the early case of *Askew* v. *Dupree, 30 Ga.* 173, as well as from countless other decisions, that while marriage differs in many respects from ordinary contracts, it is primarily a contract, and that there can be no marriage without the "consensus" of the parties. We quote from the decision in the *Askew* case (p. 178) as follows: "Marriage, being a contract, is of course consensual, for it is of the essence of all contracts to be constituted by the consent of both parties. *Consensus, non concubitas, facial matrimonium,* the maxim of the Roman civil law, is, in truth, the maxim of all law upon the subject; for the *concubitas* may take place for the mere gratification of present appetite, without a view to anything further; but a marriage must be something more; it must be an agreement of the parties, looking to the consortium vita; and agreement indeed of the parties capable of the *concubitas,* for though the *concubitas* itself will not constitute marriage, yet it is so far one of the essential duties for which the parties stipulate, that the incapacity of either party to satisfy that duty nullifies the contract." "By the common law and the law of this State, a mutual agreement to be husband and wife, by parties able to contract, followed by cohabitation, is recognized as a valid marriage. *Askew* v. *Dupree, 30 Ga.* 173; *Dillon* v. *Dillon, 60 Ga.* 204, 209; *Clark* v. *Cassidy, 64 Ga.* 662; *Smith* v. *Smith, 84 Ga.* 440 (11 S. E. 496, 8 L. R. A. 362); *Dale* v. *State, 88 Ga.* 552 (15 S. E. 287); *Southern Railway Co.* v. *Brown, 126 Ga.* 1, 2 (54 S. E. 911); *Drawdy* v. *Heslers, 130 Ga.* 161, 168 (60 S. E. 451, 15 L. R. A. (N. S.) 190); *Oliver* v. *State, 7 Ga. App.* 695, 697 (67 S. E. 886)." *Wynne* v. *State, 17 Ga. App.* 263 (86 S. E. 823).

There is no evidence whatever to indicate that there had ever been any formal marriage of the defendant and the deceased. Was there a common-law marriage? In her statement to the jury the defendant made no claim to be the wife of the deceased, and testified in such a way as to indicate that she considered the place where she lived as *her* home, and not that of the deceased. Ella Bridges testified that she did not know whether or not her son and the defendant were living together as man and wife, and that three weeks before the homicide the deceased "come home." Ollie Watts testified that the defendant and the deceased had been living together for some time in one room of the house where witness was living; that the defendant was known as "Allen" and was called "Allen," and that she guessed "they lived as husband and wife," but did not know; that the defendant "moved in the house by herself," and the deceased "come about a month later." The witness Tom Watts "reckoned" they were living as husband and wife.

The burden rested upon the movant to prove that she and the deceased were husband and wife. The evidence appears sufficient to show the "consortium," but, to our minds, it signally fails to prove the "consensus." In short, we are of the opinion that the evidence fails to show that the parties ever intended to enter into the relationship of husband and wife, and that, on the contrary, it strongly tends to show that the "consortium" was only meretricious. We therefore hold that the objection to the evidence was not good, and that the court did not err in overruling this ground of the motion for a new trial.

The second special ground is substantially the same as the preceding one, and there is no merit in it.

Being neither insisted upon nor mentioned in the brief of counsel for the plaintiff in error, the last special ground, complaining that the court erred in failing, without any request so to do, to define "felony," will be treated as abandoned. Were it considered, however, we should be constrained to hold that it is not meritorious. See *Helms* v. *State,* 138 *Ga.* 826 (7) (76 S. E. 353).

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*