## FELLOWS *v.* THE STATE.

1. Although newly discovered evidence may tend to establish the truth of a material contention in direct support of which testimony was introduced at the trial, such evidence is not merely cumulative when it relates to a particular fact concerning which no witness had already testified. Thus, where in a criminal trial the defense was alibi, and the accused introduced witnesses who testified that on the day of the commission of the crime they saw the accused in a county other than that in which it was perpetrated, he being on that day, according to the testimony of some of them, at one place in the county to which their testimony related, and, according to the testimony of others of them, at other places therein, and, according to the testimony of all, too far from the scene of the offense to have been possibly present at the time of its perpetration, newly discovered testimony of still another witness, which placed the accused, in the county where the other witnesses located him on the day in question, at a different hour and place from any testified to by them, is not merely cumulative, though it of course tended, like the other testimony, to establish the truth of the defense of alibi.

2. In a case of the nature above indicated, where at best the correctness of the verdict of guilty is to be most gravely doubted, and apparently there should have been a verdict of acquittal, a new trial should be granted upon such newly discovered evidence ; for under such circumstances it is most probable that upon another trial that evidence would, in connection with that which had been previously introduced, result in a verdict of not guilty.

3. Applying these rules to the present case, the court should have granted a new trial ; for it appeared that there was no want of diligence in discovering the new evidence, which was of the character outlined above, and the showing made in respect thereto was in all respects legal and complete.

Submitted October 22, — Decided November 16, 1901.

Indictment for rape.   Before Judge Felton.   Jackson superior court.   September 30, 1901.

*J. A. B. Mahaffey* and *Shackelford & Shackelford,* for plaintiff in error.   *C. H. Brand, solicitor-general,* and *W. W. Stark,* contra.

LEWIS, J.   Gus Fellows was arraigned in the superior court of Jackson county, upon an indictment charging him with the offense of rape.   The jury returned a verdict of guilty, with a recommen-

dation to mercy.    The accused made a motion for a new trial, which was overruled, and he excepted.    The victim of the alleged rape was introduced in behalf of the State, and testified as to the details of the crime.    She identified the accused, and swore positively that he was the man who committed the rape, which she said took place in the immediate vicinity of her home, near Harmony Grove, in Jackson county.    The cross-examination of this witness tended to show that she was a person of little intelligence, education, or experience, but did not impeach her credibility.    It was shown by other testimony, however, that, shortly after the accused was apprehended, she was taken to the jail in Athens, where he was then confined, for the purpose of identifying him; that she pointed out another negro, in no way connected with the crime, as her assailant, and when confronted by the accused stated positively that he was not the man who had committed the crime; and that it was only after the accused had, at the instance of others, put on a coat which it was supposed had been worn by the guilty man at the time the crime was committed, that she finally identified him.    Opposed to this evidence, the accused made out by the testimony of unimpeached witnesses, most of whom were not related to him either by blood or friendship, an alibi which was perfect in every particular, which showed him to have been eighteen or twenty miles away from the scene of the crime at the time of its commission, and which, if the witnesses were to be believed, rendered it impossible for him to have been guilty of the offense as charged in the indictment.    It is worthy of remark that, before any evidence tending to establish an alibi was introduced, the accused made his statement, in which he recounted in the minutest detail his whereabouts on the day the crime was committed; and this statement, in every essential particular, and in many of its trivial details, was completely corroborated by the witnesses who followed him.    This statement was to the effect that the accused had had trouble with his wife a day or two previously to the day the crime was committed, and had beaten her; that, fearing that his wife would have him arrested and get him into trouble, he decided to leave home and visit the family of a relative, Ellen Nail, or Ellen Johnson (she seems from the record to have been called by both names), who lived about eighteen miles distant in the adjoining county of Hall, near Gainesville; and that, in pursuance of this intention, he set out, early in the morning of the day the crime

is alleged to have been committed, on the way to the home of this relative. In his hand he carried a small bundle containing sundry articles of clothing. He met several persons during the course of his journey, some of whom were known to him and some not. Part of the way he was allowed to ride in the rear of a wagon which overtook him on the road, and in this wagon were two men, Amos Fuller and Homer Ogle, neither of whom had previously known the accused. Arrived at the home of Ellen Nail, he remained there until about nine o'clock in the morning, when he went, in company with his cousin, Gaines Johnson, a son of Ellen, to the home of a Mr. Kilgore, near by, to see if he could get work. Kilgore was not at home, but his wife and son both saw the accused, and the former directed him to return when her husband was at home, as she did not know whether he wanted to employ any one or not. This was between nine and ten o'clock, and, according to the testimony of the State's witnesses, the crime took place at about ten o'clock, at a place about eighteen miles distant from the home of the Kilgores, and in another county. The accused then returned, according to his statement, to the home of Ellen Nail, where he remained until after dinner. In company with Gaines Johnson, he then set out on foot for Gainesville, where he remained until about ten o'clock that night, returning again to the home of his relatives, where he spent the night. Fearing arrest on account of the trouble with his wife, the accused had, throughout the day on which these occurrences took place, gone under the assumed name of William Winn. On the following day his brother, Aaron Fellows, came to where he was, and warned him that a posse was in pursuit of him, but said nothing about the rape which had been committed, and left the accused under the impression that he was wanted for beating his wife. He then went into hiding, and on October 26, two days after the commission of the crime, he was arrested and lodged in jail.

Such, in substance, was the statement of the accused. He gave the names of a number of people whom he had seen on the day of the crime, and without exception these witnesses corroborated his statement and established his alibi. With two exceptions, these witnesses were not in any way related to the accused. Many of them had never seen him before the day on which the crime with which he is charged was committed, but were enabled, from one circumstance or another, to identify the accused as the man whom

they had seen on that day, several miles distant from the scene of the crime.    All of them identified him as a man who carried a small bundle, or budget, in his hands.    Fuller and Ogle both testified as to the defendant having ridden for some distance in the rear of a wagon in which they were riding, and they were able to fix positively the date of the occurrence from the fact that they were on their way to Gainesville to get a coffin for the child of Fuller's brother, the child having died the day before.    They also corroborated the accused in the trivial detail as to what greetings were exchanged between him and his cousin, Ellen Nail, when they met.    Mrs. Kilgore and her son both testified that on the morning of the crime, between nine and ten o'clock, the accused, accompanied by Gaines Johnson, came to their house and applied for work, the accused giving his name as William Winn.    In like manner, all the other details of the alibi were established by substantial proof.    In rebuttal of this testimony, the State offered evidence to the effect that the accused was seen in the vicinity of the place where the crime was committed, about the time of its commission. This rebutting testimony was positive as to the identity of the accused, but was very inconsistent as to circumstantial details.    It was in irreconcilable conflict with that offered by the defense to establish an alibi.

The motion for new trial was upon the general grounds that the verdict was contrary to law and the evidence, and upon the further ground of newly discovered evidence.    This evidence is outlined in an affidavit of R. R. Hitchcock, as follows: "  .    .   That on Wednesday, the 24th day of October, 1900, the day Miss Dola Hood is said to have been raped at a turnip-patch near the residence of Claud Scoggins, deponent saw the defendant, Gus Fellows, six miles south of Gainesville in Hall county, on the State road two miles above Sugar Hill P. O., and about three hundred yards from Ellen Nail's, and it was between nine and ten o'clock a. m.    This was about twenty miles from Harmony Grove.    On the same day, about four o'clock p. m., deponent met the defendant, Gus Fellows, with Gaines Johnson, something like 1 1/2 miles from Gainesville, south of Gainesville, and defendant was walking towards Gainesville. Deponent further swears that, about or between ten and eleven o'clock a. m. on the same day, he saw Amos Fuller and Homer Ogle on said road with a coffin in a wagon.    Deponent is positive of the

day, from examining his bills of cotton sold that day, and from ex-
amining a bill of goods bought that day; and he swears that it was
Gus Fellows and the day stated, beyond all reasonable doubt.　De-
ponent further swears that he never informed defendant nor either
of his counsel until this day." This affidavit was supported by other
affidavits to the effect that the accused and his counsel had used
all diligence to discover testimony before the trial, and did not know
anything about the evidence of Hitchcock; and that the affiant,
Hitchcock, was a man of high character and thoroughly worthy of
belief.　Upon the refusal of the court below to grant a new trial on
the ground of this newly discovered evidence the decision of the
case in this court turns.

The portion of the affidavit of Hitchcock in which he swears to
having seen the accused about four o'clock in the afternoon on the
day of the crime, in company with Gaines Johnson, was clearly
cumulative, as Gaines Johnson himself testified that he was with
the accused at the time and place mentioned; and it is also unnec-
essary to consider that portion which refers to the meeting of the
deponent with Fuller and Ogle, as it merely corroborates testimony
as to a particular fact to which other witnesses testified on the trial
in the court below.　But the first part of the affidavit, in which the
deponent states that he saw the accused between nine and ten
o'clock in the morning, presents a very different aspect.　No wit-
ness on the trial testified to having seen the accused at that time
and place.　It is true that many witnesses gave testimony going
to establish the defense of alibi, but each of these witnesses swore
to a different fact or set of facts from that offered to be proved by
the testimony of Hitchcock.　For many reasons, which need not
be here discussed, a jury might believe Hitchcock when they would
not believe any of the other witnesses who testified to the ultimate
fact of alibi.　This evidence was clearly material to the issues in
the case, and, if believed, ought to result in the acquittal of the ac-
cused.　This case, we think, is directly controlled by the decision
of this court in *Dale* v. *State*, 88 *Ga.* 552.　In that case, as in this,
the defense relied on was alibi, and, incidentally to that defense, a
question arose as to the identity of the accused, who was indicted
for bigamy as J. O. H. Nutall alias W. R. Dale, but who claimed
that he and Nutall were entirely different persons, and that he had
never borne the name of Nutall.　The accused was convicted, and

he moved for a new trial on the ground, among others, of newly discovered evidence of witnesses who knew Nutall in North Carolina, and who, by means of certain distinguishing characteristics, were able to swear that, while Dale and Nutall were very much alike, they were not one and the same man.    On that point the same question was raised in the *Dale* case as in the case now under consideration, that the newly discovered evidence was merely cumulative of the evidence offered by the defense on the subject of alibi. In that case our present Chief Justice, who delivered the opinion of the court, used the following language (see page 561):    " Cumulative evidence is defined to be ' additional evidence offered to establish a fact to which witnesses have already testified.'    It does not necessarily include all evidence which tends to establish the same ultimate or principally controverted fact.    1 Abbott, Law Dic. 331, and cases cited.    Although the defendant's evidence as to alibi related to the same general question, to wit that of identity, this newly discovered testimony, dealing as it does with the comparative appearance and characteristics of Nutall and the defendant, is wholly different in its nature;    and although there was other evidence on the latter subject, this testimony, especially that of Mrs. McCraney, as we have shown, relates to distinct facts as to which there was no evidence on the trial.    It therefore can not be regarded as merely cumulative within the meaning of the law as to new trials."    See also *Cooper* v. *State*, 91 *Ga.* 362.

Applying this rule to the present case, we think it clear that the accused was entitled to a new trial on the ground of this newly discovered evidence; for while it tended to support the ultimate defense of alibi, to which many other witnesses had sworn on the trial, it was in no sense cumulative of any particular fact already proved, going to make up that defense.    On the contrary, it is evidence of a new fact, to which no other witness had sworn.    It located the accused at a different place and time from that testified to by any other witness, and to that extent was a separate and distinct alibi.    While it harmonizes entirely with all the other evidence introduced in behalf of the accused, it might be true independently of the truth of that other evidence.

The principle of law here announced would of itself require the reversal of the judgment of the court below; but we take occasion to state in this connection that we the more readily give the case

this direction, on account of the very grave doubt existing in our minds of the possibility, under the record before us, of the guilt of the accused.   The case made by the State was by no means strong. Opposed to it is the overwhelming testimony of a large number of witnesses, which, if worthy of belief, rendered it impossible for the accused to have committed the crime with which he is charged. It is inconceivable-that such a defense as appears in this record could have been fabricated, and we are at a loss to understand how the jury could have disregarded evidence apparently so strong and convincing as that which supported the defense.   In view of all the circumstances of the case, we are convinced that the ends of justice require that the accused be given a new trial.

<div align="center">

*Judgment reversed.     All the Justices concurring.*