## 34287. GRAHAM v. THE STATE.

CARLISLE, J. 1. "Where, from the affidavits submitted in connection with a motion for a new trial, based on newly discovered evidence, it appears that the testimony relates to material facts which, upon another investigation, would likely produce a different result, and could not by the exercise of ordinary diligence, have been obtained at the trial, a new trial should be granted. This is true even though it be impeaching in its character, if it tends to establish a new and independent fact indicating the defendant's innocence." *Saylors* v. *State,* 9 *Ga. App.* 227 (70 S. E. 975); *Harper* v. *State,* 50 *Ga. App.* 298 (177 S. E. 886); and see *Fellows* v. *State,* 114 *Ga.* 233 (39 S. E. 885). In the instant case, there was no counter-showing made to the ground of the motion for a new trial, based on newly discovered evidence; and it appears from the affidavits in support of this ground that there was no want of diligence in discovering the new evidence, as the affiant furnishing the new evidence was not a resident of the county of the alleged crime, was only a dinner guest in the home next door to the scene of the alleged crime, and no one was aware, until after the trial, that he had the defendant under his observation during the time in which the alleged crime was supposed to have been committed; and while the newly discovered evidence is contradictory of the evidence offered by the witnesses for the State and is necessarily impeaching of those witnesses, it is not purely so; and while such evidence is corroborative of the defendant's statement and cumulative of that statement, it is not *cumulative of any evidence* adduced upon the trial, but is evidence of a fact which, if submitted to the jury and believed by them, would produce a verdict of acquittal, in that the affiant swears that the defendant was under his observation during the entire time that the alleged assault was committed, if the State's witnesses as to the sequence of the events are to be believed, that the defendant did not enter the prosecutrix' house, that the prosecutrix was not with the defendant during that time, and that the father of the prosecutrix came out of the house and struck the defendant without apparent provocation, and if true, the defendant could not have assaulted the prosecutrix at all, with or without intent to rape. We think, therefore, there was a manifest abuse of the court's, discretion in refusing the defendant a new trial under the circumstances of this case and the uncontroverted facts contained in the affidavits in support of the ground of the motion for a new trial, based upon newly discovered evidence.

2. Since the same question is likely to recur upon the new trial, we will say here that the trial court did not err in admitting in evidence the testimony of the prosecutrix that on a prior occasion this same defendant had offered her "five dollars to go down the alley with him." Since the case involves a sexual offense or crime, the evidence here comes within the exception to the rule that evidence of other crimes is inadmissible. *Dorsey* v. *State,* 204 *Ga.* 345, 349 (49 S. E. 2d, 886); *McMichen* v. *State,* 62 *Ga. App.* 50, 51 (7 S. E. 2d, 749); *Allen* v. *State,* 201 *Ga.* 391, 395 (40 S. E. 2d, 144), and for the latest expression of the Supreme Court on the subject of evidence of other crimes, see *Bacon* v. *State,* 209 *Ga.* 261 (71 S. E. 2d, 615).

3. As to the competency of the eight-year old prosecutrix as a witness, see *Russell* v. *State*, 83 *Ga. App.* 841 (65 S. E. 2d, 264); *Long* v. *State*, 84 *Ga. App.* 638 (6) (66 S. E. 2d, 837).

*Judgment reversed. Gardner, P.J., and Townsend, J., concur.*

DECIDED OCTOBER 15, 1952.

*Gibson & Maddox, R. A. Moore, Elie Holton,* for plaintiff in error.

*J. R. Walker, Solicitor-General, Kopp & Peavy, Dewey Hayes,* contra.

The defendant, Lamar Graham, was indicted and convicted on March 19, 1952, of having committed the offense of assault with intent to rape on a female child under the age of fourteen years, on January 26, 1952. His motion for a new trial, based on the usual general grounds and three special grounds, was denied and he excepted.

The entire evidence bearing upon the defendant's commission of the alleged offense comes from Helen, the child alleged to have been assaulted, who was .eight years of age at the time of the trial, her sister, June, aged ten, and the father of the children. It appeared from the testimony of the children that on the night of the alleged offense the defendant came to their home at a time when their parents were not present and after the children had retired for bed. Helen and her sister were in a bedroom of the home in which there was no light burning. June was in the bed and Helen was sitting on the bed. The defendant came into the room and endeavored to get Helen to go with him to another room in the house. She refused. He took her by the arm and "drug" her out to the backdoor steps and from there led her out behind an outdoor toilet where he offered her "a dollar and a dime to spend the night with him." She refused, saying that her mother had instructed her to stay in bed. The defendant then told her that if she told anyone what had transpired between them he would kill her. At that time they saw the lights of an approaching automobile and departed from behind the outdoor toilet; the defendant went around one side of the toilet and she around the other. As she came around from behind the toilet her father and the defendant were engaged in a fight.

The father testified that when he and his wife returned home the child June called to them as they were approaching the house and said that the defendant had Helen, and that they had gone out the back door; that he went through the house looking for the missing child, preceded by his wife who was calling for her; that when he reached the back yard of his house he saw the defendant come from behind the toilet and asked him what he was doing there, to which he replied, "Nothing"; that he asked him if he knew where Helen was and he said that he did not know; that he asked him what he had been doing in his house and he replied that he had not been there; that at that point he saw his daughter Helen come from behind the toilet on the side opposite that from which the defendant had emerged, and he "hauled off and hit him" (the defendant) a couple of times and told him to go home and not to come back bothering him. The father also testified that he lived in one of a row of six houses; that Mr. Powers occupied the first house on the west end of the row. Mr. Batten occupied the second. He occupied the third. The Woods family occupied the fourth. Mr. Daniels occupied the fifth and the defendant's family occupied the sixth. He also testified that there was one outdoor toilet for each two houses; that there was a space of some twelve or fifteen feet between the toilets and the houses and that this space was frequently used by the occupants of the houses in passing to and fro between the various houses.

The defendant in his statement to the jury maintained that on the night of the alleged offense, he had been visiting his aunt in the Powell house which is on the opposite end of the row of houses from his own, that he went home by the back way, and that when he "got just passed" the backdoor of the child's house and was leaning over the water spigot, the father came up and without a word struck him over the head and he knew nothing more until he found himself in jail; and that he had had nothing to do with the child.

In special ground 1 the defendant contends that he is entitled to a new trial on the basis of the newly discovered evidence contained in the affidavit of Roy Graves. The affidavit is attached to this ground of the motion and is duly accompanied by affidavits of the movant and his counsel as to their diligence,

and as to the residence, associates, means of knowledge, character, and credibility of the affiant Graves. The material portions of Graves' affidavit are substantially as follows: "I am twenty-nine years old; I am married, the father of five children . . . I reside with my wife and children in the City of Pearson [Coffee County]. During the evening of January 26, 1952, my wife and children and I came to the City of Douglas for the purpose of visiting Mr. and Mrs. LeRoy Woods, who reside on Ross Street in the City of Douglas, arriving at their home in the neighborhood of 7 o'clock. Mrs. Woods is my sister. The home occupied by Mr. and Mrs. Woods is situated immediately east of the home occupied by Woodrow Kirkland [the father of the prosecutrix] and fifteen or twenty feet therefrom. The sanitary facility for the joint use of the Woods dwelling and the Kirkland dwelling is situated in the rear of said dwellings slightly to the southwest of the Woods dwelling, and at a point that would be approximately mid-way between said dwellings if it were situated nearer to them. Lamar Graham, sometimes called Buddy, stopped at the Woods home while enroute from the Graham home, which is the easternmost of six houses in a group, to the home of Aubrey Powell which is the westernmost, and talked with me for some time before proceeding to the Powell house. Mrs. Powell is an aunt of Lamar Graham and was ill at the time. Shortly thereafter I heard an automobile drive up to the front of the Woodrow Kirkland home. About the same time, probably a few moments later, Mrs. Woods announced that supper was ready to be served. I went to the place where the wash basin was located for the purpose of cleansing my hands and discovered there was no water in the pail or bucket. I took the bucket and went out to the spigot in the rear, and near the sanitary facility or toilet fixture, to get water and as I was filling the bucket I saw Lamar Graham's father, Charlie Graham, coming from the home of Aubrey Powell and Mrs. Powell. He went on to his home at the east end of the group of houses. I completed the filling of the bucket or pail and started back into the rear of the Woods home when I observed Lamar Graham also coming from the Powell home at the west end of the group of houses above referred to. Before I got into the house he had reached the spigot where I had

filled the bucket and stopped, apparently to drink, and he had leaned over toward it. At the same instant Woodrow Kirkland, or a person identified to me as Woodrow Kirkland, came out of the Kirkland house or home and approached Lamar Graham and apparently without saying a word and without noticeable provocation struck him with some instrument. They clenched or grabbed each other or entangled themselves in some way and I distinctly heard Lamar Graham say, "Don't hurt that little girl." I looked toward the facility referred to and discovered some little girl at the door apparently very much frightened and when she got an opportunity she ran out and toward the back door of the Woods home where we were visiting. It was my child that had been in the facility. When I first observed Lamar Graham coming from toward the Powell home on the west end of the group of houses he was constantly in my sight until I turned to walk the four or five steps to the back door of the Woods home, and he positively did not go into the Kirkland home and was positively alone coming from the Powell home. I did not try to separate the men because there was so much blood in evidence that I thought it was a cutting affray. After the fight began, Mrs. Kirkland, or a woman I was told was Mrs. Kirkland, and her children came to the back door of the Kirkland home and probably out onto the ground. I would not know definitely because several people, including some children, gathered around before Lamar Graham was taken to the hospital on account of injuries received in the fight."

Special ground 2 is based upon the alleged incompetency of the prosecutrix.

Special ground 3 is based upon the court's alleged error in admitting in evidence the prosecutrix's testimony that on another occasion prior to the time of the present alleged offense, the defendant had offered her $5 to go down the alley with him.