### 1801. ROBINSON *v.* THE STATE.

1. In a prosecution for bigamy the State makes out a prima facie case by proving the first marriage, and that while the first spouse was living the defendant contracted a second marriage, knowing that the first marriage had not been dissolved by death or divorce; and the knowledge need not be shown by direct evidence, but may be inferred from circumstances.

*(a)* The defendant may rebut the prima facie case by showing five years' absence and no information of the fate of the first spouse at the time of the second marriage.

*(b)* Where the State makes out a prima facie case, and' the defendant introduces no evidence, but makes a statement from which it appears that the first spouse had been absent for five years and no information had been received of the fate of such spouse, and the jury finds the defendant guilty, the verdict is not without evidence to support it, even though the

defendant's statement is not contradicted by any evidence on the part of the State, inasmuch as the jury is not required to attach any probative value to the defendant's statement, even when uncontradicted.

2. Five years' absence of husband or wife, without information of the fate of the absent spouse, creates a presumption that he or she is dead, so that the other spouse may marry again without committing the offense of bigamy, even though in fact the absent spouse be not dead.

(a) A charge is erroneous which instructs the jury that even though the statutory period of unheard of absence has intervened, the defendant, in order to bring himself within the exception just stated, must exercise reasonable diligence and make diligent inquiry to ascertain whether or not the absent spouse is in fact dead or alive. To avail himself of this provision in his favor, a defendant must bring himself within its words and spirit, but the quantum of diligence is a question of fact for the jury, dependent upon the circumstances of each particular case.

3. In a prosecution for bigamy, if it appear to the satisfaction of the jury that the defendant honestly believed that the first marriage had been dissolved by a divorce obtained by the other spouse, and this belief was induced by reasonable diligence to ascertain the truth, the jury would be authorized to infer that there was no joint operation of act and intent to commit a crime.

4. While the defendant was on trial for the offense of bigamy, his first wife, who was not permitted to testify against him, was in the court-house, and just as the defendant was beginning to make his statement to the jury she moved her chair around immediately in front of the defendant, within three feet of him, between him and the jury, and sat there for two minutes looking the defendant squarely in the face in a manner that disconcerted and confused him; later on, after she had moved back by a table at the request of the trial judge, while the defendant was proceeding with his statement and assuring the jury of his good faith in contracting the second marriage, the first wife laughed out loud, in a manner deriding and contradicting him; and just as he was closing his statement and telling the jury that he and his second wife intended to live together as man and wife some day, whatever the outcome of the case on trial, the prosecutor, the second wife's father, exclaimed in an angry, boisterous tone, in a manner contradicting him, "You will never do it, sir!" The judge, after two minutes had elapsed, requested the wife to move back by a table, and admonished the prosecutor, by telling him that remarks were improper while the defendant was making his statement, but did not otherwise reprimand or punish the persons guilty of the misconduct, and did not caution the jury against being influenced or prejudiced by the incidents. Held, that the right of the defendant to make a statement in his own behalf was illegally interfered with, and that, even in the absence of a request from counsel, the trial judge should have taken more drastic action to cure the error.

5. Where a person is on trial for the offense of bigamy, it is erroneous to admit, over his objection, evidence tending to show that about seven years prior to the second marriage, while he was still living with his first wife, he had been arrested on a charge of cruelty to his wife; nor should evidence tending to show that the defendant had mistreated and

neglected to care for his first wife and the children of that marriage be admitted, over his objection that it is irrelevant.

Indictment for bigamy, from Lowndes superior court—Judge Mitchell. March 8, 1908.

Argued May 4,—Decided October 5, 1909.

*Copeland & Dukes, O. M. Smith,* for plaintiff in error.

·*W. E. Thomas, solicitor-general,* contra.

RUSSELL, J. The defendant, William Robinson, was convicted of bigamy, and excepts to the judgment overruling his motion for a new trial. There was evidence on the part of the State tending to show that the defendant was married in Providence, R. I., on June 25, 1891, to one Catherine Conway; and that he was married a second time at Valdosta, Georgia, on June 11, 1908, while his first wife was still living. In making out a prima facie case and in proving the first marriage, a policeman of Lawrence, Mass., was allowed to testify that on June 9, 1901, he arrested the defendant for cruelty to his first wife; and the defendant's fifteen-year-old son was also allowed to detail the family life of the defendant and his first wife, and to relate incidents tending to show that he was very cruel and inconsiderate of his first wife and his family. It appears from the State's evidence that the defendant separated from his first wife some time in the spring of 1902, and that he never communicated with her or with his family in any way after August 8, 1902. On that day, it seems, he wrote the first wife a letter, which is as follows: "Kindly inform me by return mail if you are going to let me have my tent and tools and lemonade outfit or not. You have deprived me of making a lot of money this summer: Now kindly give me a definite answer, yes or no. If I don't get them by next Tuesday, you can keep them, as they will be of no use to me after then, as I will leave this country at once and will never bother you again— so you can get a divorce or do as you see fit. God pity the children!" So far as the evidence shows, the defendant never communicated with and was never heard of by his wife or his family after this letter was written, until after his second marriage. The defendant introduced no witnesses. From his statement it appears that he lived in New England with his first wife for several years, but that their married life was very unhappy. His first wife was addicted to the use of intoxicating liquor, and she would frequently

come home in an intoxicated condition, and had several times threatened his life. She was of such a violent disposition that he found it impossible to live with her with any degree of comfort or happiness. In June, 1902, she left his home and went to another city, and after waiting for her for several months and endeavoring to get her to return, he wrote her the letter referred to above; and getting no reply, he himself left home. For about a year after that time he traveled about the country from one place to another, following his vocation, which was pictorial painting. In the spring of 1903 he went back home and endeavored to find his wife, but could get no trace of her. He was at that time informed by his sister that soon after he left home, his wife secured a divorce from him. This same information was given to him later by people he met in Dallas, Texas. He had never seen or heard from his first wife for more than five years prior to the time he contracted the second marriage, and did not know anything of her whereabouts, though he had made diligent efforts to locate her, in order that he might get his children and take them to live with his own people. He contracted the second marriage in good faith, honestly believing that he had a right to do so, and with no intention of violating the law. There is in the record a great deal of evidence in addition to what is summarized above, but it has no direct bearing on the issues involved. Other facts are hereinafter stated.

1. The first ground of the motion for a new trial raises the point that the verdict is contrary to law and without evidence to support it. Bigamy is defined by our law to be the offense of "knowingly having a plurality of husbands or wives at the same time. . . If any person, being married, shall marry another person, the lawful husband or wife being alive, and knowing that such lawful husband or wife is living, such person so offending shall be punished by confinement at labor in the penitentiary for not less than two years nor longer than four years, and the second marriage shall be void. . . Five years absence of the husband or wife, and no information of the fate of such husband or wife, shall be sufficient cause of acquittal of the person indicted." Penal Code, §§376, 377, 378. In the case of *Parnell* v. *State,* 126 *Ga.* 103 (54 S. E. 804), it was held that where one of the parties to the marriage has been absent and unheard of for a period of five years, the other party may presume that he or she is dead, and contract a second

marriage without fear of a conviction of bigamy. See also *Murchison* v. *Green,* 128 *Ga.* 339, 343 (57 S. E. 709, 11 L. R. A. (N. S.) 702) ; *Dale* v. *State,* 88 *Ga.* 552 (15 S. E. 287).

While the statute makes knowledge of the continuance in life of the first husband or wife a part of the offense, it must be remembered that this knowledge may be inferred from circumstances, and does not have to be proved by direct evidence. The State would make a prima facie case by proving that the defendant contracted a second marriage while his first wife was living; and if the defendant could prove that his wife had been absent and unheard of by him for more than five years prior to the time the second marriage was contracted, or that his first wife had obtained a divorce, he would be entitled to an acquittal. While the evidence on the part of the State does not show affirmatively that the defendant's wife had not been absent and unheard of by him for the statutory period, it was not necessary that the State should show this in order to make out a prima facie case. It does not appear, otherwise than from the defendant's statement, that his wife had been absent and unheard of by him for more than five years prior to the time he married the second time; and since the jury may disregard his statement, even when uncontradicted, the verdict is not without evidence to support it. If the defendant had by evidence proved the matters appearing in his statement, and the State had produced no evidence tending to contradict it, the assignment of error that the verdict is without evidence to support it would have been meritorious. Where the absent spouse has been absent and unheard of for the statutory period, there is a presumption of death upon which the defendant could have acted in contracting the second marriage; and this presumption would have protected him from a prosecution for bigamy. Penal Code, § 378; *Murchison* v. *Green,* supra.

2. The judge charged the jury as follows: "The law provides that five years' absence of the husband or wife, and no information of the fate of such husband or wife, shall be sufficient cause of acquittal of the person indicted under the preceding section [section 376 of the Penal Code]. This is plain, and I apprehend you understand it. That is to say, that if the wife was absent for five years, and the defendant had no information of the fate of such wife, that he made reasonable inquiry, or exercised

reasonable diligence in an effort to ascertain the fact, then, under the law, he would not be guilty of the offense of bigamy." The assignment of error is that the charge in effect instructed the jury that if the wife had been absent and unheard of by the husband for the period of five years, the husband could not contract a second marriage, unless he had made diligent inquiry and exercised reasonable diligence to ascertain whether or not the wife was in fact living or dead. Where the absent spouse has been unheard of for a period of five years, there is a presumption that he or she is dead; or at least there has intervened a circumstance which when uncontradicted will protect the person contracting the second marriage from a conviction of bigamy. Penal Code, § 378. And there is no specific burden on the defendant to exercise reasonable diligence and make diligent inquiry to ascertain whether or not he can ascertain facts to overcome the presumption which the law raises for his own protection. As is pointed out in Bishop on Statutory Crimes, § 596, a defendant, "to avail himself of a provision in his favor, need only bring himself within its words, however much he may have violated its spirit. If one on trial did not in fact 'know' that the former husband or wife was living, though he might have known had he chosen to inquire, he is within the exception of the statute and is to be acquitted." This, of course, does not mean or include a wilful, intentional avoidance of information the accused might have acquired in the ordinary course of events; and "absence means absence from the places where she would naturally be expected to be found. It is difficult to understand how there could be written into the statute by the trial judge a qualification which nowhere appears therein, and thus place upon the defendant a burden which the law itself does not place upon him. If in fact the spouse has been absent and unheard of by the defendant for a period of five years, then he is not guilty of the offense of bigamy in marrying a second time, though the second marriage would not be valid. When we look to the history of the legislation creating the offense now under discussion, it will be seen how contrary to every rule of interpretation it would be to read into the statute such a qualification as the trial judge did in the case at bar. At the early common law it was not an offense to marry a second time during the life of the first spouse, though it was contrary to the ecclesias-

tical law.  In 1604 a statute was passed creating the offense, but expressly excepting a person "whose husband or wife should have remained seven years beyond the sea, or the same period within his majesty's dominions not known by the other to be living." 1 Jac. 1, ch. 11.  This statute is the fountain head of later legislation on the subject, and while the seven-year period still remains of force in most jurisdictions, we have in Georgia reduced it to five years.  It would certainly be a strange result to hold that a person whom a criminal statute expressly excepts from its provisions must use reasonable diligence and make diligent inquiry to bring himself within the exception.  The trial judge probably misconstrued the language in the case of *Parnell* v. *State,* supra.  In that case it was held that a husband who contracted a second marriage before the expiration of the five-year period of unexplained absence did so at his peril; and if it turned out that his wife in fact was living, he was nevertheless guilty, even though he honestly believed at the time of the second marriage that she was dead.  That case, however, expressly recognizes that this result would not obtain where the full statutory period has elapsed.  The court says that in the absence of a statute of any kind creating the exception, the defendant's good faith and honest belief would avail him on the question of criminal intent in making the second marriage, even where the second marriage had been contracted only a year or two after separation and absence, provided it appeared that the defendant had exercised reasonable diligence to ascertain whether or not his belief was well founded.  It will be seen, however, that the expression "reasonable diligence" was used by the court in the discussion of a suppositious question suggested by what might be true if we did not have a statute which we do have.

3.  Exception is taken to the following portion of the judge's charge:  "Then, too, it is contended and the court so charges you in this case, that if you believe, from the evidence in the case, that the defendant honestly believed that he had been divorced from his wife, that he made such diligent inquiry in that respect as was necessary to ascertain the truth of this (you will look to the evidence in the case and see whether or not the defendant made any efforts to ascertain whether or not his wife had been divorced), if he did make reasonable and diligent effort to ascer-

tain that fact, and believed, after this inquiry, that he had been really divorced from his wife, and in good faith acted upon that, why then, in that event, he would not be guilty of the offense of bigamy." It will be seen, by examining the sections of the Penal Code governing the offense of bigamy, that it is made a part of the offense that the defendant "knowingly" contracts a second marriage while the first one is undissolved. Of course, if the first marriage has been dissolved by divorce at the time of the second marriage, there is no crime. There is a difference between knowledge and belief. A person may honestly believe a thing and yet not know it, and honest belief will not avail a person who has committed an act in violation of a criminal statute. See *Webb* v. *State,* 6 *Ga. App.* 353 (64 S. E. 1001). But where knowledge is made a part of the offense, so that the scienter must be proved by the State, this rule does not apply, since the burden is on the State to prove the guilty knowledge. As we have already said, however, the State would probably make a prima facie case by proving the first marriage, that the first wife is still living, and the second marriage, since there is a presumption that the first marriage once created has never been dissolved. 5 Cyc. 700. In the case of *Parnell* v. *State,* supra, there is a dictum that if the defendant honestly believes that he has a right to make the second marriage and it appears that this honest belief is the result of reasonable diligence to ascertain the truth, then the jury would have a right to infer that the defendant had no criminal intent, and was therefore not guilty of any crime. We think this dictum sound. Our law declares that "in the commission of a crime there must be a union or joint operation of act and intention." Penal Code, § 31. This applies to all crimes. And where honest belief, founded on reasonable diligence to ascertain the truth, appears, the defendant should be acquitted, if the jury has a reasonable doubt as to whether or not there is criminal intent—a necessary ingredient of every crime. See, in this connection, *Miley* v. *State,* 118 *Ga.* 274 (45 S. E. 245); *Ager* v. *State,* 2 *Ga. App.* 158 (58 S. E. 374); *Richardson* v. *State,* 3 *Ga. App.* 313 (59 S. E. 916). While the charge excepted to is probably a correct statement of the law, at the same time it would be well to add, in connection therewith, that in arriving at intention and at the bona fides of the defendant, the jury would

have a right to consider all the circumstances connected with the perpetration of the offense; and by an examination of the charge as a whole, it appears that this principle, as embodied in the Penal Code, § 32, was correctly given in charge to the jury. Where a defendant honestly believes that his first wife has secured a divorce and it appears that his belief is founded on reasonable diligence to ascertain the truth, the jury would be authorized, though not required, to find that the defendant had no criminal intent in entering the second marriage. If a man honestly believes a thing and has made diligent inquiry to ascertain the truth about it, the law would authorize the jury to infer bona fides or absence of intent, which would entitle the defendant to an acquittal.

4. Several of the assignments of error complain that the defendant was not allowed to make a statement in his own behalf in the manner prescribed by law. In order to properly understand this assignment of error, it is necessary to set out the grounds of the motion for a new trial raising this complaint. They are as follows: "Because during the progress of the trial, and at the time defendant was making his statement to the jury, he was embarrassed, confused, and prevented from making a free and deliberate statement, as was his right, by the conduct of his first wife, to wit: at the time defendant began his statement to the jury, Catherine Robinson, who was present in the court-room and near and facing the jury, picked up her chair and placed it directly in front of defendant, about three feet from him and immediately in front of defendant, and between him and several of the jurors, between the defendant and the jury, her back being to the jury, and remaining in this position for about two minutes, and until ordered by the court to 'move back by the table;' which conduct on the part of Catherine Robinson greatly hampered and confused and disconcerted defendant, to the prejudice of his right. . . While defendant was making his statement, and while he was using the following language, to wit: 'Mr. Powell advised me a couple of times to go, . . that I could pay back my bondsmen in a little while, . . I told him I would not desert Dora [meaning his second wife] for all the women in the world, or all the money in the world; Catherine Robinson, who was in the court-room and near and facing the

jury, and in hearing of the jury, and near the defendant, laughed out loud, hysterically, and in manner jeering, deriding, and ridiculing the defendant, which conduct confused, embarrassed, and deprived him of his right to a fair and impartial trial." It appears that after the first wife had been sitting in the position immediately between the jury and the defendant, just as he began his statement, for about two minutes, the judge told her to "move back by the table," and, when she laughed in the manner set forth above, the judge told her "not to do that again." It is contended that the judge should have reprimanded her more severely, and have cautioned the jury not to be influenced by her conduct. Another incident is set forth as follows: "Because during the progress of the trial, and while defendant was making his statement, and at the time he was using the following language, to wit: 'Whatever the outcome of this case might be, we [meaning his second wife and himself] intend to live together as man and wife, sooner or later,' the prosecutor [the father of the second wife] interrupted in an angry, boisterous tone, heard by the jury and throughout the court-room, and exclaimed, 'You will never do it, sir,' which interruption confused, embarrassed and intimidated the defendant, to the prejudice of his right to a fair and impartial trial." It appears that when the prosecutor made this remark, the trial judge said, "No remarks, Judge Simms [referring to the prosecutor]; they are improper." These exceptions are certified without qualification. It is claimed that the trial judge should have reprimanded the prosecutor more severely, and have cautioned the jury not to be influenced or prejudiced by the incident.

It appears from the brief of the solicitor-general that in his opinion the trial judge, in his desire to be perfectly fair to the accused, was probably led to exaggerate somewhat these incidents in certifying to their truth. It also appears from his brief that the prosecutor is a man of considerable influence in the community where the prosecution took place, and that the State had gone to considerable expense in bringing many witnesses all the way from New England for the purpose of carrying on the prosecution. For these reasons it is urged that the court should not grant a new trial because of incidents like those set forth above, unless it clearly appears that they affected the final result of the

case. The ability of the learned solicitor-general is too well known to this court for us to believe that he thinks for one moment that the prominence of the parties concerned, or the expense to which the State and county have been put, would have influence on this court in making its decision. We have referred to this portion of the brief for the chief purpose of saying that these suggestions are highly improper. This court was established for the purpose of correcting errors of law; and where an error of law has been made, it is our duty to correct, whether the parties concerned are the humblest or the most prominent in the State. His suggestion that another trial will result in additional expense to the State is of no moment, if in fact the defendant has not had the fair and impartial trial which was guaranteed to him by the constitution and the law. Nor can we consider the suggestion that the trial judge has in his certificate exaggerated the importance of the incidents referred to above. The certificate of the judge is absolutely conclusive upon us, and back of that we can not go, whether he has certified truly or falsely. The experience and ability of the learned solicitor-general, and our knowledge that he is well acquainted with these elementary principles, lead us to suspect that counsel for the plaintiff in error are correct in the suggestion that the solicitor-general, seeing the error which has been committed, is grasping at straws, and agree with counsel that in calling the attention of the court to these facts dehors the record, he plainly indicates the way the wind of passion and of prejudice blew when the defendant was on trial for his liberty. In the bill of rights which the people themselves have set up for our government as well as their own, it is declared that "no person shall be deprived of life, liberty, or property, except by due process of law;" that " no person shall be deprived of the right to prosecute *or defend* his own cause in any of the courts of this State, in person, by attorney, or both;" and further, that "every person charged with an offense against the laws of this State shall be confronted with the witnesses testifying against him, and shall have a public and speedy trial by an impartial jury." From the time when at Runnymede, about seven centuries ago, King John placed his signature to Magna Charta, until the present day, it has been the habit of English-speaking people to 'deprive a fellow-man of his liberty only after a fair trial by an impartial

jury, and after their verdict finding him guilty of the offense charged. And Magna Charta was not a new pronouncement of our rights, but a reiteration of the immemorial law of the land. A fair trial means one in which there shall be no bias or prejudice for or against the accused, and in which not only the witness chair and the jury box, but the court-house also shall be purged of every suspicious circumstance tending to take from the accused any of the rights given to him by the law. While it is impossible to transmit to this court from the trial court an exact picture of the trial, the conduct of the officers, the intonation of the voices, the subtle influences which hurt but which can not be helped, there is enough in this record to lead us to believe that this defendant has not had a fair trial, and that he has not been permitted to make a statement, freely and uninterruptedly, in his own behalf in the manner prescribed by law. It appears that he was being prosecuted by the father of the woman whom he had taken for his second wife; that this father was a man of prominence in the community, while he was a native of another clime, and had been in that community only a short while, and that while he was making his statement and declaring that whatever might be the outcome of the case then on trial, he and the daughter of the man who was prosecuting him had made up their minds to live together as man and wife, sooner or later,— while he was thus declaring to the jury his purpose and his intention, he was interrupted by the prosecutor, who said, in an angry, boisterous tone, heard by the jury and throughout the court-room, "You will never do it, sir." Although the law says that a man shall testify only after he has taken an oath to tell the truth, and although the law says that the defendant's statement can be contradicted only from the witness chair, this prosecutor was allowed to tell the jury that the defendant would never do what he said he would do. Could there have been a contradiction of his statement which would have been more disastrous or more influential on the jury? In addition to this, the law gives the defendant on trial for bigamy the right to keep his first wife from testifying against him; and yet testimony may be delivered in other ways than by the use of words. When the defendant began his statement, his first wife picked up her chair, and came around immediately in front of the defendant, within three feet

of him, between him and the jury, with her face turned directly on the defendant and her back to the jury, and stayed in that position for two mniutes.   Later on, when the defendant had recovered from this humiliating and embarrassing incident, and was proceeding with his statement, and as he was telling the jury that although, he had been advised by friends and others to leave the scene of the prosecution, that his bondsmen would consent to it, and he could pay them back, and as he was saying ·to the jury, "I told him (the friend) I would not desert Dora (the second wife) for all the women in the world, or all the money in the world," the woman, who could not enter the witness chair against him, while facing the jury and in their hearing laughed out hysterically, and in a manner jeering, deriding and ridiculing the defendant, and the trial judge certifies that this incident confused and disconcerted the defendant.   It is urged, however, that since it appears that the trial judge admonished these parties by telling them not to repeat the conduct, and by causing the first wife to remove her chair after she had remained there two minutes, this court should not grant a new trial, especially since the defendant's attorneys did not move for a mistrial, and did not request the judge to caution the jury to disregard the incidents.   It is true that ordinarily counsel must make timely objection to the misconduct, and not lie idly by, and then make post mortem attempts to get another trial; and a new trial is not granted solely on this ground; but sometimes requests from counsel are unnecessary, and the judge, who is the arbiter, fair and impartial between the State and the accused, and who above all others should know the law and know when the defendant's rights have been infringed, and should know what is necessary to repair the damage done, ought of his own motion to interfere and take vigorous action.   If at the time of the incident the judge does nothing and waits for the defendant's counsel to take the initiative, the jury is apt to get the idea that the reprimand and the caution comes, not from the judge, but from the attorney.   While, as already stated, if this were the only error in the record a new trial would not be granted, we take this occasion to state that the trial judge should not wait for suggestions from counsel, but should act of his own motion when he sees and knows that a defendant's rights are being violated.   When a man is on trial

for his liberty, proper decorum in the court-room should be maintained by the trial judge. In the present case the judge should have taken more vigorous action to repair the damage done. At least he should have cautioned the jury that they could not act upon outside information respecting the parties, the witnesses, or the facts in the case. Civil Code §5337; *Georgia Railway & Electric Co.* v. *Dougherty, 4 Ga. App.* 614 (62 S. E. 158). In *Woolfolk* v. *State,* 81 *Ga.* 558 (8 S. E. 724), where a defendant was on trial for murder, it appears that at the close of the solicitor-general's opening argument the crowd in the court-house applauded; and subsequently, while the solicitor-general was making the closing argument to the jury, certain persons back in the audience cried, "Hang him, hang him!" The presiding judge rapped for order, and gave instructions that the disorderly person be removed from the court-house, though it does not appear whether or not the instructions were carried out. The Supreme Court held that this action on the part of the judge was not drastic enough, the court saying: "We think the judge should have stopped the argument of the State's counsel then and there, and ascertained the guilty parties, and should have punished them to the extent of the law. He should have taught them that the law was supreme, that the trial of a man for his life, however heinous the crime charged against him might be, was a serious and a solemn thing, and that the law would not permit a mob to interfere, either by applause or by threatening and exciting cries." And yet the incident there could not have had as damaging result as the combined conduct of the parties in this case. There the crowd approved the argument of the State's counsel; here outsiders who were partisans interfered with, contradicted, and humiliated the defendant while he was making his statement, upon which might depend his liberty. This court is now thoroughly committed to the proposition that section 1010 of the Penal Code means what it says, to wit, that a defendant "shall have the right to make to the court and jury such statement in the case as he may deem proper in his defense." What is the right worth if it may not be exercised? And how can it be exercised with any degree of effectiveness under the circumstances set forth above? The court itself should not unreasonably interfere with the defendant while he is making the

statement; and much less should outsiders. *Richardson* v. *State,* *3 Ga. App.* 313 (59 S. E. 916); *Woodall* v. *State, 4 Ga. App.* 783 (62 S. E. 485); *Woodward* v. *State, 5 Ga. App.* 447 (63 S. E. 573).

5. Since there is to be another trial, we may say that the exceptions to the testimony set out in the 23d, 24th, and 25th grounds of the motion for a new trial are well taken. In proving the main case on direct examination the State was allowed to prove, over the defendant's objection, that a policeman had arrested him in Lawrence, Mass., in 1901 on the charge of cruelty to his wife. The State offered this policeman for the purpose of proving the first marriage. After the policeman had testified that he knew that the defendant was the husband of Catherine Robinson, the alleged first wife, the solicitor-general asked the witness how he knew it. The witness then replied that while he was on his beat in Lawrence, Mass., in the year 1901, he heard screams in the direction of the defendant's house, and, on going there, found the defendant and his wife in a fight; that he arrested the defendant, and, while under arrest, he said, "You can not arrest me without my wife's consent," and then identified Catherine Robinson as his wife. It has been held that the first marriage can be proved by the defendant's admissions; but it would be a strange result if the law allowed extraneous and inadmissible evidence lugged before the jury, tending to show that the defendant had several years before the time alleged in the indictment, in a different State, been charged with the commission of wholly separate and distinct offenses from the one charged in the indictment, merely because the witness, in giving the source of his knowledge, saw fit to go into such matters. In testifying to a relevant fact a witness can not relate irrelevant matter of a most prejudicial kind. The issue made by the indictment and the defendant's plea of not guilty was whether or not he had knowingly contracted the second marriage while his first wife was still living and undivorced. There was nothing in the indictment to put the defendant on notice that he would be called upon to defend himself from the charge that, seven years prior to the time alleged in the indictment, he had been arrested in a distant State for an offense in no way connected with the one charged in the indictment. The evidence tended to confuse the jury, to prejudice them against the defendant, and

to take him by surprise and put him to the defense of a charge which he was not informed would be brought against him. The general rule is that upon the trial of a person for a criminal offense, other and distinct criminal transactions can not be given in evidence against him. *Gay* v. *State,* 115 *Ga.* 204 (41 S. E. 685); *Davis* v. *State,* 113 *Ga.* 749 (39 S. E. 295). The qualification of the rule is that where the guilt of the defendant depends upon the intent, purpose, or design with which the act is done, or upon his guilty knowledge, or where the proof of the other transaction establishes a motive for the offense for which the defendant is being tried, or where there is a causal connection between the offenses, growing out of the fact that they are related in time and similar in other relations, evidence of other criminal transactions may be received. *Farmer* v. *State,* 100 *Ga.* 41 (28 S. E. 26). The growth of this rule, as well as of the qualification, is well illustrated in the case of Regina *v.* Oddy, 2 Den. C. C. 264, Thayer's Cases on Evidence, 257. In that case the defendant was on trial for the offense of having received certain cotton goods, knowing them to be stolen property. The indictment alleged that the goods which were the subject-matter of the offense were found in the defendant's possession on March 3, 1851, and that the cloth was the property of one Isaac Boocock. Mr. Pickering, for the Crown, was arguing that it was permissible to show that the defendant was found in possession of other pieces of cloth about four months prior to the time alleged in the indictment, which cloth was stolen from another mill and belonged to different owners. The following colloquy took place between Mr. Pickering and the presiding Justices,—Baron Alderson, Justice Coleridge, and the Chief Justice, Lord Campbell:

*"Alderson, B.*—In R. *v.* Sirrell, tried before my Brother Talfourd and myself at Liverpool the last Winter Assizes, there was evidence of other stolen articles being found in the house, and that circumstance was offered in evidence on the part of the prosecution, but we rejected it.

*"Pickering.* In R. *v.* Mansfield, C. & M. 140, the possession by the prisoner of other articles, found under circumstances which raised a presumption that they were stolen, was allowed to be proved, though it was not shewn from whom they were stolen. . .

*"Alderson, B.*—May you not as well contend that on an indict-

ment for burglary, which necessarily avers an intent to steal (or to do some felonious act), you may shew that the prisoner committed another burglary, in order to shew his intention to steal?

"*Pickering.* The two cases are quite distinct; there it is a question of intention, and you infer the intention from the act itself; that is to say, from the breaking and entering the house at night you infer the intention to steal: here it is a question of knowledge, which you can not infer from the act of receiving alone, but must gather it from other and independent circumstances. It must be conceded that the moral weight of such evidence is irresistible. Suppose a thousand articles, all stolen at different times, either from the same or different persons, and all of them to be found in the possession of the prisoner, could any one doubt that he received them with a guilty knowledge?

"*Lord Campbell, C. J.*—The moral weight of such evidence, in any individual case, would no doubt be very great,; but the law is a system of general rules; and it does not admit such evidence, because of the inconvenience which would result from it.

"*Pickering.* But in several analogous cases the law does admit such evidence, notwithstanding the inconvenience; and there the inconvenience, which is confessedly the only ground of exclusion, is tolerated in order that justice may not be defeated. The inconvenience is put upon two grounds; first, that of the prisoner being taken by surprise; secondly, of many different issues being raised.

"*Lord Campbell, C. J.*—Yes. That is so. . .

"*Alderson, B.*—But here one robbery was in March, and the other in December previous. Can you mention any case where evidence has been admitted of a transaction which took place three months before the time to which the indictment relates?

"*Pickering.* Yes. In Ball's case, R. & R. 132, the former uttering, of which evidence was given to shew a guilty knowledge, took place about three months before the offence charged in the indictment. But the interval of time which may have elapsed between the previous offence, which is offered in evidence, and the one charged can not affect the question. It can only affect the weight of the evidence—not its admissibility. . .

"*Alderson, B.*—May you not say that at any rate one act of uttering is similar to another act of uttering?

"*Pickering.* Not in any other sense than you can say that one

act of receiving stolen cloth is similar to another act of receiving stolen cloth.   .   .

"*Alderson, B.*—I am of opinion that this evidence was inadmissible.   One reason why such evidence has been held to be admissible, in charges of uttering, may be, that one act of uttering a forged note or bill may be said to be similar to another act of uttering a forged note or bill.   And so it is clear that the act received in evidence is of the same nature as that which it is admitted to explain. But here the evidence merely went to shew that the prisoner was in possession of other property which had been stolen in the previous December, and not that he had received such property knowing it to be stolen.   Now the mere possession of stolen property is evidence, prima facie, not of receiving, but of stealing; and to admit such evidence in the present case would be to allow a prosecutor, in order to make out that a prisoner had received property with a guilty knowledge, which had been stolen in March, to shew that the prisoner had, in the December previous, stolen some other property from another place, and belonging to other persons.   In other words, we are asked to say, that in order to shew that the prisoner had committed one felony the prosecutor may prove that he committed a totally different felony some time before.   Such evidence can not be admissible."   Coleridge, J., Platt, B., and Talfourd, J., concurred.   It is interesting to note that under an act of parliament subsequently adopted (34 & 35 Vict. c. 12), where a prisoner is charged with the offense of receiving stolen goods or having them in his possession with guilty knowledge, the fact of having in possession other stolen property within twelve months is receivable in evidence to show guilty knowledge.   And if the Crown will give the prisoner seven days notice of its intention to do so, it is permissible to prove that at any time within four years prior to the finding of the indictment, the defendant was convicted of an offence involving fraud or dishonesty.   Stephen, Dig. Ev. Art. 11; Thayer's Cases on Evidence, 261.   See *Ray v. State, 4 Ga. App.* 67 (60 S. E. 816).   But the rationale of the rule of allowing evidence of other offences to be proved in cases of that kind does not extend to the limits allowed by the trial judge in the case at bar.   In a certain sense the fact that a man has committed one crime might in some degree make it more or less probable that he would commit another one; but such evidence is not rejected because it is irrele-

vant primarily, but because it tends to confuse the issues, to take the prisoner by surprise and put him to the defense of charges not made issuable by the indictment, and tends generally to prejudice the jury against him, and to put his character in issue against his will and without his consent.

In the 24th and the 25th grounds of the motion for a new trial complaint is made that the court erred in allowing the defendant's son, William Robinson Jr., to relate certain details of the family history, of a kind very damaging to the defendant, and tending to show that he had been very negligent in caring for and inconsiderate of the welfare of his first wife and their children; and also that the defendant's grandmother had called to see the defendant's first wife some time during the first part of the year 1909. While it does not plainly appear, we infer that the purpose of this visit had reference to the defendant's welfare in the preparation of his case for trial on the charge of bigamy. The objection to this evidence was that it was irrelevant, illegal, and inadmissible; and in our opinion the objection was well taken. We do not see wherein it tended in any way to show that the defendant was guilty of the offense of "knowingly having a plurality of wives at the same time."

*Judgment reversed.*