## STATON *v.* THE STATE.

No. 8801. APRIL 14, 1932.

*Parham & Simpson, James C. Davis, William G. McRae,* and *Walter E. Harclerode,* for plaintiff in error.

*George M. Napier, attorney-general, John A. Boykin, solicitor-general, T. R. Gress, assistant attorney-general, J. W. LeCraw,* and *John H. Hudson,* contra.

HILL, J. James S. Staton was indicted and tried for the murder of Thomas J. Martin. He was found guilty, with a recommendation to mercy, and was sentenced to life imprisonment in the penitentiary. He filed a motion for new trial, which was amended by the addition of two special grounds. The motion was over-

ruled, and he excepted. The special grounds of the motion for new trial are (1) because of certain newly discovered evidence; and (2) because of the failure of the judge to charge the law with reference to the defense of alibi.

■ The evidence was sufficient to authorize the verdict. It tended to show that Staton was a United States soldier stationed at Fort McPherson in Fulton County, and that on May 20, 1931, between 11:00 and 12:00 o'clock p. m., he shot and killed another soldier named Thomas J. Martin, at or near the corner of Lee and Mickleberry Streets, near Ft. McPherson. The evidence showed that Martin was walking along the street with a young woman named Georgia Phillips, with whom he had attended a dance at the service club at Ft. McPherson. Miss Phillips testified that she and Martin "watched them dance" for a while, and then together walked down Lee Street; that Staton, walked by them in company with a companion two or three times, and then came up to where they were and pointed a pistol at Private Martin. Martin replied, "You are not going to shoot me, are you?" "Mr. Martin and I were between the second and third car-stop down from Ft. McPherson gate when one of them shot him. At the time of the shooting Mr. Staton said to Mr. Martin: 'Hands up.' I didn't know his name at that time. When this man says 'hands up,' Mr. Martin says: 'You are not going to shoot me are you?' And he says 'hands up' again, and shot him. This other soldier that was with Staton when Staton shot him was standing right by his side; this other soldier didn't say anything. The one who shot him was the one that had the broken arm and bandage on. The one that did the shooting that night is sitting right over there at that table. It is Mr. Staton. After he shot Martin, Staton turned to me and says, 'Now, you put your hands up,' and I ran, and he shot at me but didn't hit me. This man shot at Mr. Martin two times, and shot at me once. When I broke and ran away and he shot at me, both of them ran away from there towards East Point. When those two men ran away from there, I went out there in the street and stopped an automobile. Those people in the automobile didn't get out and go over to where Mr. Martin was lying on the sidewalk; they came up there and waited a few minutes and then came back up there and parked the car right in front of where they was, and they were out there looking at him, and Mr. West came up

there and wanted to know what was the matter, and they told him, and he wanted to carry me to jail and called the ambulance; so he put me in the car and carried me down and turned me over to policeman Couch, and I was later carried to the police station here in Atlanta that night. That night they brought Staton and some more soldiers up there, and I identified him out of the crowd."

Q. "Did you tell this man West or Short or Collins what happened there?" A. "Yes, sir."

R. W. Johnson, for the State, testified: "In May of this year I was soldiering out at Ft. McPherson, in the service company. The service company takes care of the transportation, preparation of meals, things like that. I know James F. Staton. I have known him probably twelve years. I knew him since he has been in the service and at Rome, Georgia. I am 26 years old. I don't know exactly how old Staton is. I have been in the service eight years and two months. I knew him before I entered the service at Rome, Georgia. I lived neighbor to him up near Rome before I joined the army. I knew his mother and his kinfolks. Staton and I were friends and neighbors before I came to the army, and we have been friends since that time. I saw Staton that night that Private Martin was killed between 11 o'clock and midnight; he came in my room after 11 o'clock, and evidently had been drinking. I got close enough to him to talk to him. I could smell his breath and smelled whisky on him; he came in my room that night and told me that he had killed a man, and I stood there and talked to him a little bit, and he started out. He had a gun with him, and I was intending to get it, and he objected and went on out. I merely asked him to let me have the gun, I didn't try to take it; he just objected. He said: 'No.' He stayed in my room there a very short time. Lightfoot was there in the room with me; we just room together. I could not tell anything about the size and caliber of the pistol. Staton did not tell me where he had killed a man or who the man was. At that time I did not know that Private Martin had been shot, I found out next morning that Private Martin had been killed out there on Lee Street near the Fort. I have told the meaning of everything he said, whether it is in the exact words or not I don't know; there is no reason why I should want to state his exact words to the court and jury."

F. F. Lightfoot, for the State, testified: "About the 20th of

May of this year I was in the service company at Ft. McPherson. I have been in the army a little over three years. I know James F. Staton. I have known him about a year, I guess; something like that. This year in May he was stationed with the service at Ft. McPherson. R. W. Johnson was my roommate on the 20th of May, the man who just left the witness-stand here. I saw Mr. Staton when I was out there at the Fort, the night Mr. Martin was killed, and it was between 11 o'clock and midnight he came to my quarters. When he came in the room he says: 'Hook, Hook,' he says: 'get up, get up.' Hook is my roommate, Johnson, that's Johnson's nickname. When he says, 'Hook, Hook, get up; I am messed up and messed up plenty,' words to that effect. Hook then says, 'What's the matter,' and he says, 'I have killed a man;' and Johnson says, 'Oh bull,' or something like that. When that conversation was going on we were still in bed, both of us. When Hook says, 'Oh bull,' Staton said, 'Sure enough, I have,' and so Hook got up and tried to take his gun away from him. He would not give him the gun, and he tried to put him to bed. Staton had the gun, and he walked out the door. He says, 'I am going to kill myself or go over the hill, one.' This expression, 'go over the hill,' in army life is to leave without permission. I didn't see Staton any more that night. I didn't know at that time that Private Martin had been killed. I learned about the death of Private Martin the next morning. Staton said something about he had two or three more. I don't remember exactly now what he says, but something to that effect."

Private E. H. Chastain, for the State, testified: "I was connected with Ft. McPherson in May of this year, in the capacity of kitchen police. I know where the quarters of Johnson and Lightfoot were located about May 20th or May 21st. I remember when Private Martin was killed. I did not go anywhere near the quarters of Johnson and Lightfoot at that time. I was on kitchen police on Thursday after the killing, and that is as close as I went to the quarters where they stayed. Private Martin was killed on Wednesday night. I discovered some shells about ten steps from the quarters of Johnson and Lightfoot. I found the shells about three steps from the kitchen door, right in front, between the door of the kitchen and their door where they slept; they were on the ground; those quarters where Johnson and Lightfoot were sleep-

ing do not open out on a wide walkway; it is on the back side; only a walk goes down there; between the entrance to the quarters there and the walkway towards the parade ground is just a vacant space there of dirt. There has been grass and some of the grass has died out there. I found two shells at first, and I went and looked again for others after I was told, and found another one. I don't recognize this envelop. I haven't seen that. I did not do that writing. I recognize this wrapping here. Sergeant Burner wrapped those shells up; these shells are the same make as the ones I found; the first two I found I picked up just like that ['illustrating], turned them over to Sergeant Burner, holding them just like that [illustrating], and after talking with him I went back and made another search. I went back when I was told, and found that shell about a step apart from the two. I picked it up on a match stick, and he taken that paper out of the waste basket there on the porch, and I laid the shell on the paper. He rolled it up, and I didn't see the shells any more until I came to court." The shells were offered in evidence without objection.

The foregoing and other evidence offered by the State was sufficient to authorize the jury to find the defendant guilty.

■ There are only two special grounds in the motion for new trial, numbered 4 and 5. Ground 4 is as follows: "Because, since the trial of the case on September 22, 23, and 24, 1931, and the rendition of the verdict, certain material evidence, not merely cumulative and not solely impeaching in its character, but relating to new and material facts, has been discovered by movant, and said newly discovered evidence is set out in an affidavit of Worth Andrews, hereto attached and made a part of this ground, marked Exhibit A. Movant shows that said exhibit shows that said Worth Andrews was an eye-witness to the shooting of Thomas J. Martin on the night of May 20, 1931, the man whom defendant is charged with having shot, and that said Worth Andrews saw that said Thomas J. Martin was shot by a man whose left hand was bandaged, and that said Worth Andrews has looked at and inspected this defendant, and knows that the person who shot Thos. J. Martin was not this defendant. Movant avers: (a) That the probable effect of the said newly discovered evidence, if another trial is had, would be to produce a different result, favorable to movant. (b) That the newly discovered evidence is material to the issues involved in

the case. (c) The application for a new trial upon this ground was brought to the notice of the court within the time allowed by law for entering a motion for new trial in said case, and while the motion for a new trial in said case was pending, and before said motion for new trial was passed upon by the trial judge. (d) That in addition to the affidavit of Worth Andrews the affidavits of Mrs. J. H. Danforth, H. N. Osborne, J. C. Parker, marked Exhibit B, Exhibit C, and Exhibit D, are hereto attached and made a part of this ground, showing the residence, associates, means of knowledge, character and credibility of said witness Worth Andrews, by whom the newly discovered evidence is to be given. The name of the said witness is Worth Andrews, and the names of the associates of said witness are J. C. Parker, H. M. Osborne, and Mrs. J. H. Danforth. (e) All of the affidavits hereto attached and made a part of this ground are properly entitled in the cause and properly identify the case. (f) Movant also attaches hereto, marked Exhibit E, and Exhibit F, which are hereby made a part of this ground of the motion, affidavits of movant, and movant's attorneys at law, J. R. Parham, B. F. Simpson, Jas. C. Davis, and W. E. Harclerode, showing that neither they nor any one of them knew of or could have discovered the newly discovered evidence before the rendition of the verdict, by the exercise of ordinary care by them respectively; and facts are set out in said affidavits, respectively of movant and his counsel, that show what diligence they exercised to ascertain the said evidence before the rendition of the verdict. (g) Movant also attaches hereto, marked Exhibit G, and Exhibit H, which are hereby made a part of this ground, the affidavits of Mrs. Martha Andrews and Mrs. Bessie Love, showing that said newly discovered evidence came into the hands of movant's counsel after the rendition of the verdict against movant on September 24, 1931; also affidavit of Mrs. J. H. Danforth, marked Exhibit J. (h) Each and all of said affidavits referred to in this ground are hereto attached, and made a part of this ground, reference to which is prayed as often as may be necessary."

The general rule is that newly discovered evidence, in order to be sufficient to require a new trial, should be of such character as would likely produce a different result on another trial. *Adams* v. *State,* 172 *Ga.* 260 (2) (157 S. E. 625); and see *Webb* v. *State,*

166 *Ga.* 218 (6) (142 S. E. 898). The newly discovered evidence of Worth Andrews is to the effect that he went by the scene of the homicide in an automobile between 11:30 and 12:00 o'clock on the night of May 20, 1931, and saw a man with a bandaged left hand reach into his hip-pocket and pull out a pistol and shoot the other man twice. The affidavit states: "When we were in approximately eight or ten feet of the men and woman, one of the men was standing to the right of the man who had his back toward us. The man with his back towards us was a tall man, approximately six feet in height; he was bareheaded and wearing a white shirt and dark trousers, and did not have on a coat. I saw him reach into his right-hand hip pocket and draw a pistol therefrom with his right hand and shoot the other man twice. We were driving around 15 or 20 miles an hour, and when the shots were fired Mr. Mabry immediately checked the speed of his car and came almost to a stop. I was on the rear seat in the right-hand side of the car and was within eight or ten feet of the man when he fired the shots, and I kept looking back all of the time until we passed out of sight of the place where the shooting occurred. I saw one man run away or attempt to run from the scene of the shooting. Deponent has seen and talked with James F. Staton, now held in the Fulton County jail, charged with the murder of Mr. Martin; and deponent swears that he is not the man that fired the shots that he witnessed; that when he returned home the next morning he told his mother about seeing one man shoot another on Lee Street, as above mentioned; that his mother advised him not to tell any one about it, for fear that he would have to attend court; and that he did not tell any one else about the said shooting until he was interviewed by the detectives, and the person he told of the shooting was Mr. J. R. Parham, on October 10, 1931."

The State made a counter-showing, and introduced the affidavit of E. W. Ginn, who swears that he is a detective on the Atlanta police department, with which he has been connected for ten years; that he was attached to and was a part of the homicide squad of the Atlanta police department during the months of May and June, 1931; that he and L. W. Evans were the detectives who prepared the case of the State v. James F. Staton, charged with killing Thomas J. Martin on the night of May 30, 1931, at Ft. McPherson, Georgia, and he examined a large number of witnesses in the prep-

aration of said case for trial; that in May or June, 1931, before the trial of James F. Staton, Worth Andrews stated to deponent that he was not at or near the scene of the shooting of Thomas J. Martin on the night of May 20, 1931, at Ft. McPherson, that he did not see any shooting done, that he did not hear any shots fired, that he did not know who did it, that he could not identify anybody in connection with said shooting, that he knew nothing about said shooting, but saw a crowd there as they passed by the fort, and that deponent and his partner had been misinformed as to Worth Andrews being a witness to said shooting. L. W. Evans, who is referred to in the affidavit of Ginn, testified to the same effect. Hugh Mabry also furnished an affidavit in which he stated that he was with Worth Andrews on the night of May 20, 1931, and passed Ft. McPherson in an automobile about 10:30 p. m.; and that he did not see or hear any shooting and does not know anything about the case of State v. Staton.

In view of the conflicting evidence presented by these affidavits, the judge became the trior of the issue as to whether the ground based upon alleged newly discovered evidence was sufficient and should cause a new trial. This court has held that where the alleged facts in favor of this ground are contradicted by counter-affidavits, a new trial will not be ordered unless the discretion of the judge is manifestly abused. A grant of new trial on the ground of newly discovered evidence is not favored by the courts. *Rushing* v. *State,* 167 *Ga.* 280 (2) (145 S. E. 453); *Hall* v. *State,* 141 *Ga.* 7 (3) (80 S. E. 307). The discretion of the judge was not abused in the instant case.

■ Ground 5 of the motion for new trial alleges that the trial judge erred in failing to charge the law upon the subject of alibi. No request so to charge was made. It is insisted that the failure to submit this issue to the jury and to instruct the jury on the issue of alibi was harmful and prejudicial, and had the effect of denying to defendant his sole defense to the charge against him; that this issue was raised by testimony of witnesses as well as the statement of the defendant. Movant cites certain evidence which he contends tended to establish an alibi, and contends that the judge should have charged upon that subject. The evidence referred to is the testimony of Sherwood Lindsey and Bert Ashworth. Lindsey testified: "I recollect the night in May of this year that Private

Martin was killed. I know where James F. Staton's quarters were. I recollect seeing Staton on the night Mr. Martin was killed. I seen him at supper and between 11:30 and 12 o'clock. Supper is served at 5:00 o'clock in the afternoon. Between 11:30 and 12 o'clock he was in bed, in his quarters. I slept in the same quarters, right side of his cot. I spoke first to him. I came in and I was there sitting down on the side of the bed fixing to go to bed. He turned over. I don't know whether I woke him up or whether he was already awake or not. I said 'Staton, a man was shot over there a while ago,' and he says 'Do they know who done it?' I says, 'I don't guess they do. I haven't heard anything about it. I just came from the hospital and came right on in. I don't know whether they do or not.' He didn't say anything else; he just turned over; and that's all there was. I didn't know at that time that it was Private Martin that was shot." On cross-examination: "I didn't see Mr. Martin. That was between 11:30 and 12 o'clock. I couldn't say whether it was nearer 12 or nearer 11:30, because I hadn't seen a clock in a good while, and I was just guessing at it. I came by the hospital. They have an 11 o'clock call. I don't know whether it had sounded or not. I didn't hear the call. I had been to town, and came by the hospital. Martin's body wasn't there at the hospital then." Ashworth testified: "On the night Mr. Martin was killed I saw James F. Staton at 9 or 9:30, between headquarters and 'G' Company, near where he sleeps; at that time he didn't seem to be drunk. I did not see a pistol on him. I said one or two words to him. I was about as close from him as from me to this gentleman [court reporter]. I didn't see where he went to. I left him standing there, and went on to the Service Company; that's one barracks between us. . . That was between 9 and 9:30. I talked with him then. I asked him was he going to the dance; and he said no, he was going to bed. I didn't see him after that. I didn't go to the dance."

This evidence did not reasonably exclude the possibility of the defendant's presence at the scene of the crime, and therefore it was insufficient to establish an alibi, and to require a charge upon that subject. The evidence of Sherwood Lindsey does not exclude the possibility of Staton's presence at the scene of the killing. The shooting must have taken place before Lindsey arrived at the barracks and made the statement to Staton. It does not appear how

much time had elapsed since the shooting and the appearance of Lindsey at the barracks. Charlie West and G. W. Green testified as to the time when they arrived on the scene after the shooting. West said when he arrived there it was about 11 o'clock. Green said he did not know exactly what time he got there, but it was around 11:30 o'clock. The shooting must have occurred, therefore, before they got there. Lindsey does not fix the exact time when he arrived at the barracks. He says it was between 11:30 and 12:00 o'clock, but just exactly when does not appear. If it was five minutes to 12 o'clock, the defendant would have had time to go from the scene of the killing to the barracks and get in bed before Lindsey arrived; and therefore it does not exclude the possibility of Staton having been present at the killing and having gone to his bunk afterwards. Alibi as a defense consists in proof that at the time when the crime was committed the accused was at a place different from that where it was committed, so as to preclude the idea that the accused was the perpetrator. *Wright* v. *State,* 34 *Ga.* 110; 1 Michie's Dig. 316. This court has held that in a very close case where there is evidence tending to show alibi it is reversible error for the judge to fail to charge upon that subject (*Moody* v. *State,* 114 *Ga.* 449, 40 S. E. 242; *Mosley* v. *State,* 165 *Ga.* 290, 140 S. E. 754); but where the evidence pointed out in the ground and relied on as establishing alibi does not establish it, that principle can not apply; and where alibi rests upon the defendant's statement to the jury, the judge is not required to charge upon the law of alibi unless there is a timely written request therefor. *Hardin* v. *State,* 107 *Ga.* 718 (3), 721 (33 S. E. 700). There is no controversy in the present case that a homicide was committed by some one, as charged in the indictment, and the issue on the trial resolved itself into one of identity. The defendant contended that he was not the person who shot and killed Martin, and in his statement he claimed that he was elsewhere. This court held, in *Dale* v. *State,* 88 *Ga.* 552 (6) (15 S. E. 287): "Where the question of personal identity and the fact of alibi are virtually the same defense, the omission of the court to instruct separately on alibi is not error." On the trial the court clearly submitted the issue of identity, in the following language: "If you should believe that a murder was committed as charged in this bill of indictment, but if you do not believe the defendant is the one who

committed the murder, or if you should entertain a reasonable doubt as to whether he committed the murder, then and in that event it would be your duty to acquit, notwithstanding, as stated before, you might believe that a murder had been committed as charged in the indictment." The testimony for the defendant did not show the impossibility of his presence at the scene of the homicide, and there was no error in the failure of the court to charge the jury specifically as to the defense of alibi. *Smith* v. *State,* 6 *Ga. App.* 577 (65 S. E. 300); *Jenkins* v. *State,* 13 *Ga. App.* 82 (78 S. E. 828).

The judge did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur.*